913 P.2d 558

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Robert DeCASTRO, Defendant–Appellant.**

**No. 16540.**

Intermediate Court of Appeals of Hawai'i.

March 14, 1996.

---

4. HRS § 703–300 (1993) defines "force" as "any bodily impact, restraint, or confinement, or the threat thereof."

Richard Crisman Linstrom (Law Offices of Richard C. Linstrom, of counsel), on the brief, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE, J.

BURNS, Chief Judge.

Defendant Robert DeCastro (DeCastro) appeals the October 7, 1992 Judgment entered by the District Court of the First Circuit convicting him of Resisting an Order to Stop a Motor Vehicle, Hawai'i Revised Statutes (HRS) § 710–1027(1) (1985), which states as follows:

(1) A person commits the offense of resisting an order to stop a motor vehicle if he intentionally fails to obey a direction of a peace officer, acting under color of his official authority, to stop his vehicle.

The district court sentenced DeCastro to probation for one year and ordered him to contribute $100 to the State General Fund. Execution of the sentence was stayed pending this appeal.

We affirm.

DeCastro asserted two defenses at trial: (1) the mistake of law defense authorized by HRS § 702–220 (1985) and (2) the choice of evils justification defense authorized by HRS § 703–302 (1985).

## FACTS

DeCastro owns Town and Country Moving headquartered in Kalihi. On Wednesday, December 18, 1991 at about 12:30 p.m., while returning to his warehouse from a delivery in Wahiawa, DeCastro drove his van (Van) in the Koko Head (southeasterly) direction on the H–2 freeway. DeCastro's employee, Westley Damas (Damas), was a passenger in DeCastro's Van. Near the Mililani exit, DeCastro and Damas observed police officer Derek Rodrigues (Officer Rodrigues) in a Honolulu Police Department blue and white vehicle (No. 734) nearly cause a "four car accident" while pursuing a speeding motorist later identified as George Hernandez (Hernandez). Hernandez had no passenger in his vehicle. After Officer Rodrigues had stopped Hernandez to issue him a citation for speeding, Officer Rodrigues noticed a white van stop about four car lengths behind his patrol car. Officer Rodrigues saw DeCastro in the driver's seat and Damas in the passenger's seat of the Van.

DeCastro testified that he stopped because he believed Officer Rodrigues had driven his police car in a reckless manner. DeCastro remained in the Van and noted the license plate numbers of Officer Rodrigues' and Hernandez' vehicles.

The Van's presence aroused Officer Rodrigues' suspicions that its occupants were friends of Hernandez. This prompted Officer Rodrigues to approach the driver's side of the Van and ask, "Oh. You with those guys up there?" DeCastro replied, "No. Do we look like we're with those guys?"

At this point, the State and DeCastro dispute what happened. DeCastro and Damas testified that, while holding his baton or nightstick in his hand, Officer Rodrigues made the following statement: "Oh, you getting pretty cocky, aren't you? You want to get cocky ... Eh, you fucker, you like beef? You like beef, you fucker? Step out. Both of you. Come on, step out." DeCastro admitted that at no point did Officer Rodrigues strike DeCastro or the Van with his baton. Nor did Officer Rodrigues wave his baton in the air or swing it at DeCastro. DeCastro testified that upon hearing Officer Rodrigues' statement, both he and Damas chuckled.

Nevertheless, DeCastro contends Officer Rodrigues' statement led him to be concerned for his and Damas' safety. Thereafter, Officer Rodrigues demanded DeCastro's license, and vehicle registration and insurance card, which DeCastro willingly provided. Officer Rodrigues then ordered DeCastro to "wait" while Officer Rodrigues returned to his patrol car.

Immediately after Officer Rodrigues walked away, DeCastro dialed 911 on his cellular phone. Unable to get through, DeCastro called his wife, Lisa Rodrigues, to arrange a conference call with the 911 operator. The transcript of the "911" conversation between the 911 operator and DeCastro discloses the following:

OPERATOR: You need a police?

DeCASTRO: No, I no need a police. I'm being harassed by a policeman.

OPERATOR: Hah?

DeCASTRO: I'm being harassed by a policeman.

OPERATOR: Where is the policeman?

DeCASTRO: Where are we in between?

OTHER: Waipio [Waipi'o] and Mililani.

DeCASTRO: Waipio [Waipi'o] and Mililani, and he's—I hope someone comes fast. He went ask us if, uh, we like fight with him.

OPERATOR: You have his license number?

DeCASTRO: H–P–D 734. He was reckless driving. We went go pull off on the side of the road—

OPERATOR: What's his number?

DeCASTRO:—to get his, uh, license plate.

OPERATOR: What is it?

DeCASTRO: And now he's out here with his nightstick.

OPERATOR: What is it?

DeCASTRO: You know what, I just—I should just go to my warehouse already.

OPERATOR: What's the license number?

DeCASTRO: His—his number is H–P–D—

OPERATOR: "A?"

DeCASTRO: H–P–D.

OPERATOR: "T" as in "Tom"?

DeCASTRO: Right.

OPERATOR: "D?"

DeCASTRO: H–P–D 734. This guy wants to fight us.

OPERATOR: You want the police right now?

DeCASTRO: Uh, well, I like just go to my warehouse, and you can send a policeman over there.

OPERATOR: Okay. When you get to the warehouse, call back.

DeCASTRO: You know what, he's gonna chase me once I leave.

OPERATOR: No, go ahead and just, uh, we got the license.

DeCASTRO: You got 'um?

OPERATOR: Yeah. Just go to the warehouse, and then call back.

DeCASTRO: Okay.

OPERATOR: Okay.

\*       \*       \*       \*       \*       \*

DeCASTRO: Now he's in back of me, and he wants to pull me over. And this guy wants to fight with me.

OPERATOR: Is he—is—is—well, do you wanna stay on the line?

DeCASTRO: Yeah, I wanna stay on the line. I want another policeman. I want another policeman at my warehouse 'cause I'm not gonna pull over.

\*       \*       \*       \*       \*       \*

I'm afraid if I pull over, he's—he's gonna arrest me, or what do you want me to do?

OPERATOR: I don't know. Is he in a blue-and-white?

\*       \*       \*       \*       \*       \*

DeCASTRO: He's in a blue-and-white. I want a policeman at 94–478 Ukee ['Uke'e] Street.

OPERATOR: But are you there now?

DeCASTRO: No, I'm on the freeway.

\*       \*       \*       \*       \*       \*

SUPERVISOR: This is the 911 Supervisor. May I help you?

\*       \*       \*       \*       \*       \*

DeCASTRO: Yeah, about an officer who I pulled over on the side of the road. I pulled him on the side of the road to take his license-plate number down. He asked me if I wanted to fight, and he came out with his nightstick.

SUPERVISOR: He couldn't be an officer.

\*     \*     \*     \*     \*     \*

DeCASTRO: Now there's three of 'um.

\*     \*     \*     \*     \*     \*

DeCASTRO: Now, now they're all coming out with their clubs. All of them have their clubs.

\*     \*     \*     \*     \*     \*

DeCASTRO: They all have their billy clubs out.

\*     \*     \*     \*     \*     \*

DeCASTRO: Now they're arresting me. Get—get the—get the chief—get the chief over here.

The State's evidence showed that before Officer Rodrigues returned to the Van, DeCastro drove it off in the same direction he was heading before he had stopped. Officer Rodrigues gave chase, using his automobile's horn, siren, and flashing lights, while maintaining a distance of about two car lengths behind DeCastro. Officer Rodrigues simultaneously called dispatch to inform them that he was pursuing DeCastro and asked for a backup unit to assist him. During the chase, Officer Rodrigues observed DeCastro "look in his rearview mirror at least ten times."

At about the same time, police officer Richard Grilho (Officer Grilho) was on the H–2 freeway heading in the same direction as Officer Rodrigues when he observed Officer Rodrigues trying to pull over DeCastro. Officer Grilho continued to "shadow" the chase to see if Officer Rodrigues needed help. Officer Grilho's testimony corroborates Officer Rodrigues' testimony that he

continually kept his automobile's siren and blue light on.

Officer Rodrigues pursued DeCastro for approximately two miles, following DeCastro onto the Waipi'o exit, at which point Officer Rodrigues noticed Officer Grilho behind him. As they reached Ka Uka Boulevard, which intersects with the Waipi'o off-ramp, Officer Rodrigues noticed police sergeant Kevin Dow (Sergeant Dow) joining the pursuit. While traveling on Ka Uka Boulevard, DeCastro had Officer Grilho on his passenger's side, Sergeant Dow on his driver's side, and Officer Rodrigues directly behind him.

As the chase continued on Ka Uka Boulevard, Officer Rodrigues a number of times saw the Van narrowly miss hitting Sergeant Dow's vehicle. The officers eventually succeeded in stopping DeCastro, but only after Sergeant Dow pulled in front of DeCastro, thereby blocking his escape.

Upon stopping DeCastro, Officer Rodrigues and Sergeant Dow approached the driver's side and Officer Grilho approached the passenger's side. DeCastro refused to open the door, the window remained locked, and he continued talking on his cellular phone. Officer Rodrigues kept knocking on the window telling DeCastro to open the door. DeCastro eventually did step out of his Van. Officer Rodrigues testified that the first remark that DeCastro made was "the chief told" him "not to stop." While being handcuffed, DeCastro put up a slight struggle.

## DISCUSSION

### I. *Mistake Defense*

■ DeCastro contends that he lacked the requisite specific intent to commit the crime because he consulted with and relied on the 911 telephone operator's permission to leave the scene.

HRS § 702–220 (1985) [1] states in relevant part as follows:

1. Hawai'i Revised Statutes (HRS) § 702–218 (1985) outlines the specifics of an "ignorance or mistake of fact" defense. The commentary states in relevant part as follows:

    This section of the Code deals with ignorance or mistake of fact ..., but it is not

intended to deal with the limited problem of the defense afforded a person who engaged in conduct under the mistaken belief that the conduct itself was not legally prohibited. That problem is dealt with exclusively by [HRS] § 702–220.

**Ignorance or mistake of law; belief that conduct not legally prohibited.** In any prosecution, it shall be an affirmative defense that the defendant engaged in the conduct or caused the result alleged under the belief that the conduct or result was not legally prohibited when he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in:

\* \* \* \* \* \*

(3) An ... administrative grant of permission; or

(4) An official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration, or enforcement of the law defining the offense.

Clearly, a 911 telephone operator is not "the public officer or body charged by law with responsibility for the interpretation, administration, or enforcement of the law defining the offense" of Resisting an Order to Stop a Motor Vehicle. Therefore, the HRS § 702–220(4) affirmative defense is not applicable.

The district court found that "the Court does not see anything in the information that could lead a reasonable person to conclude that somehow he was being given permission to leave the scene[;]" and "[DeCastro's] attempt to make a phone call via 911 was a rather calculating act, and, actually, an attempt to bootstrap some sort of defense." In contrast, DeCastro asserts, as an HRS § 702–220(3) affirmative defense, that the 911 telephone operator authorized him to proceed to his warehouse and he acted on the belief that he was legally authorized to leave.

Assuming DeCastro's assertion is true, the dispositive question is whether DeCastro has introduced evidence in satisfaction of his burden of proving that a 911 telephone operator's authorization is an "official statement of the law, ..., contained in: ... [a]n administrative grant of permission[.]" Our answer is no.

Although the source of HRS § 702–220 is § 2.04 of the Model Penal Code, not much relevant information or precedent is available to guide us. Clearly, however, the affirma-

tive defense stated in HRS § 702–220 is a relatively recent limited exception to the following very old general rule.

A defendant's error as to his *authority* to engage in particular activity, if based upon a mistaken view of legal requirements (or ignorance thereof), is a mistake of *law*. Typically, the fact that he relied upon the erroneous advice of another is not an exculpatory circumstance. He is still deemed to have acted with a culpable state of mind.

*United States v. Barker*, 546 F.2d 940, 946–47 (D.C.Cir.1976) (original emphasis) (footnote omitted).

In his concurring opinion in *Barker*, District Judge Merhige explained the rationale of the rule in relevant part as follows:

The district judge advised the jury that a mistake of law is no excuse, and, therefore, that a mistake as to the legality of the search in issue was not a defense to the charges contained in the indictment. In that regard, the district judge was applying the general rule on mistake of law that has long been an integral part of our system of jurisprudence. The most commonly asserted rationale for the continuing vitality of the rule is that its absence would encourage and reward public ignorance of the law to the detriment of our organized legal system, and would encourage universal pleas of ignorance of the law that would constantly pose confusing and, to a great extent, insolvable issues of fact to juries and judges, thereby bogging down our adjudicative system.

*Id.* at 954 (citations omitted).

Although there is no precedent interpreting HRS § 702–220(3) or its equivalent in other states, there is some precedent interpreting statutes equivalent to HRS § 702–220(4). The close relationship between the sources identified in HRS § 702–220(3) and the sources identified in HRS § 702–220(4) makes interpretations of the latter relevant to the interpretation of the former. For example, in his dissenting opinion in *Barker*, Circuit Judge Leventhal stated in relevant part as follows:

The "official interpretation" defense thus structured is a functional analogue of the defenses of reliance on a statute, judicial decision or administrative order. It is justified by its twin underlying assumptions that the official is one to whom authority has been delegated to make pronouncements in a field of law, and that the authority can be held accountable by explicitly grounding it in the hands of an identifiable public official or agency. So grounded, the interest of both private citizens and government is served by protecting actions taken in reliance on that interpretative authority.

*Barker,* 546 F.2d at 969.

The Alaska Court of Appeals interpreted its statutory equivalent of HRS § 702–220(4) as follows:

Even under the Model Penal Code's broad formulation of the "mistake of law" defense, a defendant cannot rely on an interpretation of the law provided by a police officer who happens to be available. The defendant must show that he or she relied on an *"official* interpretation" provided by *"the* public officer or body charged by law with . . . enforcement of the law defining the offense." We interpret this language to refer to a formal interpretation of the law issued by the chief enforcement officer or agency; it does not encompass extemporaneous legal advice or interpretations given by a subordinate officer.

*Haggren v. State,* 829 P.2d 842, 844 (Alaska App.1992) (original emphasis).

Assuming a 911 telephone operator's authorization is a "statement of the law . . . contained in . . . [a]n . . . administrative grant of permission[,]" there is nothing ·on the record or in the law that supports a conclusion that it is an "official statement of the law[.]"[2] There is nothing on the record or in the law that supports the conclusion that a 911 telephone operator is officially authorized to permit a motor vehicle operator to fail to obey a police officer's order. Thus, we do not reach the question of whether a 911 telephone operator's authorization is an "administrative grant of permission[.]"

## II. *Justification Defense*

HRS § 703–302 (1985) states in relevant part:

**Choice of evils.** (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to himself or to another is justifiable provided that:

(a) The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged[.]

HRS § 703–300(1) (1985) defines "believes" to mean "reasonably believes."

■ Where the defense is justification, once evidence of a fact, or set of facts, which negatives penal liability has been introduced, the burden shifts to the prosecution to disprove the facts that have been introduced or to prove facts negativing the justification defense and to do so beyond a reasonable doubt. *State v. Straub,* 9 Haw.App. 435, 444, 843 P.2d 1389, 1393 (1993).

■ As HRS § 703–302(1)(a) specifies, the necessity or choice of evils justification defense is not applicable when one or both of the following requirements is not satisfied: (1) the defendant reasonably believed that it was necessary to commit the crime to avoid an imminent harm or evil to himself or to others; or (2) the harm or evil sought to be avoided was greater than the harm or evil generated by the crime committed.

■ In *State v. Kealoha,* 9 Haw.App. 115, 118, 826 P.2d 884, 886 (1992), we held that with respect to requirement (1) above, a person does not reasonably believe that it is necessary to commit a crime to avoid an imminent harm or evil to himself or others when one or more of the following is a fact:

(a) A third alternative that did not involve the commission of a crime was reasonably available to the person;

2. *See* Annotation, *Criminal Law: "Official Statement" Mistake of Law Defense,* 89 ALR4th 1026 (1991).

(b) The crime committed was not reasonably designed to actually avoid the harm or evil sought to be avoided; or

(c) The harm or evil sought to be avoided was not imminent when the person committed the crime.

■ DeCastro asserted the choice of evils justification defense based on his contention that Officer Rodrigues' challenge to engage in physical battle created in him a fear of imminent physical harm to himself and/or Damas. DeCastro contends that he chose the lesser of two possible harms when he drove away and refused to stop. Simply put, DeCastro argues that he chose to commit the lesser harm of Resisting an Order to Stop a Motor Vehicle to avoid possibly serious physical harm to himself and/or Damas.

The district court found that "[DeCastro] did not believe that he was in any kind of imminent danger[.]" Limited to physical danger, this finding is not clearly erroneous. The record suggests that DeCastro realized that he had placed himself in a situation where a perturbed policeman had possession of DeCastro's driver's license, and vehicle registration and insurance card, and DeCastro wanted to exit that situation and move to more familiar and comfortable surroundings.

The district court concluded that when DeCastro disobeyed the police officer's order to wait there, "no reasonable person would've concluded that [DeCastro] was in any kind of imminent danger." This conclusion is not wrong. When DeCastro disobeyed the police officer's order by driving away, the police officer had not returned from his police car to DeCastro's Van.

Assuming DeCastro actually believed that it was necessary for him to commit the crime to avoid an imminent harm or evil to himself or others, it was an unreasonable belief. The events took place with Damas present, in the early afternoon on a non-holiday weekday, in the open, on a freeway and streets that are well-traveled, and in full view of motor-vehicle occupants passing by.

The harm DeCastro sought to avoid was not greater than the harm generated by the crime committed. It is common knowledge that police efforts to stop a motorist who refuses to stop his vehicle pose serious risks of danger to the participants and others.

DeCastro had at least one noncriminal alternative that would have avoided the threatened greater harm. DeCastro and his passenger could have locked themselves in the Van and communicated with the 911 telephone operator.

The crime committed by the departure was not reasonably designed to actually avoid the harm or evil sought to be avoided. As noted by the district court, DeCastro knew that "if he somehow left, that the officer was going to pursue him." It was reasonably foreseeable that the police would force DeCastro to stop before he arrived at his destination.

## CONCLUSION

Accordingly, we affirm the District Court's October 7, 1992 Judgment convicting DeCastro of Resisting an Order to Stop a Motor Vehicle, HRS § 710–1027(1) (1985).

ACOBA, Judge, concurring.

I concur in the result of this case.

Defendant failed to establish that an "administrative order or administrative grant of permission" was the basis for his action under the mistake of law defense under Hawai'i Revised Statutes (HRS) § 702–220(3) (1993).[1]

Also, because Defendant testified that he thought "it was a little bit funny" and "chuckled" when the police officer allegedly challenged him and his passenger to a fight, I believe it was within the trial court's discretion to find, under the facts of this case, that

1. I would not reach, and therefore, do not necessarily agree with the majority's analysis of the "administrative grant of permission" language in Hawai'i Revised Statutes (HRS) § 702–220(3) (1993). Defendant did not assert the mistake of law defense in his brief and did not claim that he relied on an "administrative order." Defendant, however, did argue that the transcript indicated

that he had "permission to leave," and thus, Defendant did not have the requisite intent under HRS § 710–1027 (1993) to disobey the officer's order to stop. The majority opinion characterizes Defendant's argument as one under HRS § 702–220(3) (1993).

Defendant did assert the "choice of evils" defense under HRS § 703–302 (1993) in his brief.

Defendant did not reasonably believe he was in danger of "imminent harm" under the "choice of evils" defense in HRS § 703–302(1) (1993).

However, I must disagree with the majority's reliance on *State v. Kealoha*, 9 Haw.App. 115, 826 P.2d 884 (1992) with respect to the "choice of evils" defense. I do not believe that *Kealoha* is viable authority under HRS § 703–302 because the common law requirements set forth in *Kealoha* conflict with the express language of HRS § 703–302. In that connection, HRS § 701–102(2) (1993) provides, "The provisions of this Code *govern* the construction of and punishment for any offense set forth herein committed after the effective date, as well as *the construction and application of any defense* to a prosecution for such an offense." (Emphases added.) The Hawai'i Penal Code (the Code) was adopted and took effect on January 1, 1973, prior to *Kealoha* and the instant case. 1972 Haw.Sess.L.Act 9, § 100 at 32. After that date, the express language of the Code is controlling.

Under HRS § 703–302(1), the justification defense is satisfied when the following factors are established: the defendant (1) rea- sonably believes (2) the conduct is necessary (3) to avoid harm or evil to the actor or another which is (4) imminent, and (5) the harm or evil sought to be avoided is greater than the violative conduct. However, the majority, *as a matter of law*, redefines the "reasonably believes" factor to specifically require that there be no "third alternative available" and that the conduct be "reasonably designed to *actually* prevent the threatened greater harm." *Kealoha*, 9 Haw.App. at 118, 826 P.2d at 886 (emphasis added). These requirements, first posited in *Kealoha* and applied here, are not included in the express language of HRS § 703–302.

Such requirements go beyond the factors denominated under the statute. They impose additional burdens on a defendant, not authorized, and therefore, I cannot agree with the majority's reformulation of the "choice of evils" defense statute.