968 P.2d 194

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**John GUZMAN, Jr.,Brian K. Kawahara, Walter H. Kupau, Andrew Mancao, Samuel I. Nakamura, Michael GEORGE Spain, JR., Wallace MINORU Takushi, and Stephen D. Vasconcellos, Defendants–Appellants.**

No. 20477.

Intermediate Court of Appeals of Hawai'i.

Oct. 8, 1998.

Certiorari Denied Nov. 19, 1998.

Donn Fudo and James Anderson, Deputy Prosecuting Attorneys, Alexa D.M. Fujise, Deputy Prosecuting Attorney and Ryan Cuskaden,. Legal Intern, on the brief, City & County of Honolulu, for plaintiff-appellee.

Matthew S.K. Pyun, Jr. and John M. Van Dyke, Harrison K.Kawate with them on the briefs, for defendants-appellants.

WATANABE, ACOBA, and KIRIMITSU, JJ.

ACOBA, Judge.

We hold, in this interlocutory appeal from the denial of motions to dismiss, that Hawai'i Revised Statutes (HRS) § 852–1 (1993), which prohibits the obstruction of "ingress to or egress from any public or private place," is not constitutionally vague on its face. Further, we cannot conclude, on the record

of the case thus far, that as a matter of law HRS § 852–1 was unconstitutionally applied to Defendants–Appellants John Guzman, Jr. (Guzman), Brian K. Kawahara, Walter H. Kupau, Andrew Mancao, Samuel I. Nakamura, Michael George Spain, Jr. (Spain), Wallace Minoru Takushi, and Stephen D. Vasconcellos (Vasconcellos) (collectively referred to herein as Defendants), when they were arrested while picketing on May 31, 1996 and subsequently charged with violating HRS § 852–1.

However, we further hold that on remand of this case for trial, Defendants may, if they so choose, present evidence to demonstrate that the application of HRS § 852–1 under the circumstances of this case constituted "entrapment by estoppel," violative of the due process clause of the Hawai'i Constitution, on the ground that Defendants reasonably relied on an agreement they had made with the Honolulu Police Department (the HPD or the police) regarding their picketing procedures.

We hold, thirdly, that HRS § 852–1 is not preempted by the National Labor Relations Act (the NLRA).

Accordingly, we affirm the January 10, 1997 and January 24, 1997 orders[1] entered by the first circuit court (the court) denying Defendants' motions to dismiss the HRS § 852–1 charges against them and remand this case to the court for trial.

## I.

## A.

The record indicates that on April 22, 1996, security guards for St. Francis Hospital in Honolulu, Hawai'i began picketing at the entrance to the hospital after a discontinuation in labor negotiations between the security guards and the hospital.[2] A picket line was established at the Liliha Street entrance to the hospital and picketing usually occurred daily between the hours of 6:30 a.m. and 3:00 p.m.

Before the first day of picketing, certain picketers discussed a picketing procedure with certain members of the HPD. Under this procedure, the picketers would make "three revolutions across the driveway to the hospital," then "break" the line to allow vehicles to enter and exit the driveway, and then repeat their revolutions. The picketers generally completed their revolutions in less than two minutes. It was agreed between the picketers and the HPD members that the picketers would immediately break the line "to allow ... emergency vehicle[s] to pass through without interference."

Of the strike post notations which are in evidence, one on April 25, 1996 indicates that "one doctor was upset over the delay to gain entry." The picketers thereafter agreed to immediately break the line for unmarked emergency vehicles upon such vehicles flashing their lights and sounding their horns. On May 1, 1996, it was noted that a "[c]onstruction project by [the] Board of Water [Supply] on Liliha St. just makai of the St. Francis Hospital driveway caused additional traffic congestion due to one lane in each direction being closed." Despite any delay or congestion occurring on these dates, no picketers were arrested for violating HRS § 852–1.

The first police officer to question this procedure, almost three weeks after picketing began, was Officer S. Ono (Officer Ono),

---

1. The January 10, 1997 and January 24, 1997 orders are identical.

2. The record before us consists of, *inter alia*, the following documents: the arrest report for Defendants–Appellants John Guzman, Jr. (Guzman), Brian K. Kawahara, Walter H. Kupau, Andrew Mancao, Samuel I. Nakamura, Michael George Spain, Jr. (Spain), Wallace Minoru Takushi, and Stephen D. Vasconcellos (collectively referred to herein as Defendants); a list of arrests and convictions under Hawai'i Revised Statutes (HRS) § 852–1 (1993); reports of the Honolulu Police Department (the HPD) relating

to arrests and violations of HRS § 852–1; the HPD's *Operations Manual: Labor–Management Disputes* (the manual); "strike post notations" taken by the HPD officers on duty at the picketing site on April 23 through 25, May 1, 2, and 31, and June 6, 7, 12 through 14, and 28, 1996; and affidavits submitted by Guzman and Spain. These exhibits were stipulated into evidence by Plaintiff–Appellee State of Hawai'i (the State) and Defendants. The record also includes the transcript of the November 4, 1996 hearing held by the first circuit court (the court) on Defendants' motions to dismiss the complaint.

who was assigned to the picket line on May 10, 1996. Officer Ono informed the picketers that the procedure was "unacceptable" to him and that he would conduct the picket line however he thought best. However, upon request by the picketers, Officer Ono called Sergeant Jerrold Perreira (Sergeant Perreira) to the picket line. Sergeant Perreira explained the "practice and history" of the three-revolution procedure to Officer Ono, who subsequently followed it.

Thus, the record reveals that the three-revolution procedure was followed from the commencement of the picketing on April 22, 1996 without incident for nearly six weeks until May 31, 1996, when Officer Russell Maeshiro (Officer Maeshiro) was assigned to the picket line. Officer Maeshiro had started work at 10:30 p.m. the night before and his shift ended at 7:15 a.m. on May 31. He arrived at the strike post sometime before 6:30 a.m.

Officer Maeshiro testified that upon receiving his assignment, Sergeant Perreira had instructed him to "[go] by the [HPD's] policy," but Officer Maeshiro denied that he had been informed by Sergeant Perreira about or had prior knowledge of the three-revolution procedure.

Before taking his post at the picket line, Officer Maeshiro spent a "couple of minutes" reviewing the HPD's *Operations Manual: Labor–Management Disputes*.[3] When Defendants arrived at about 6:28 a.m., Officer Maeshiro asked for the strike captain and Guzman was identified. Officer Maeshiro testified that he explained his procedure to Guzman as follows:

I explained to [Guzman] that I'll be in charge of the strike post today and basically everybody's gonna [sic] be walking the strike line and when I yell break, okay,

everybody that's [sic] in the driveway, within the prolongation of the driveway itself, can continue on to either side and the ones that [sic] are—that [sic] didn't cross the prolongation of the driveway would stay on each side and the cars would go in and out. When I say proceed again they can continue walking the strike line.

I said one warning and one warning only, after that I'll take action. To be fair, I explained, if I call break and they don't obey orders, our procedures is [sic] we go back to the strike captain and he's supposed to take care of the strikers.

Officer Maeshiro recounted that after he explained the procedure he intended to use, Guzman replied, "[N]ah, nah, [the picketers] know what they doing [sic]." Vasconcellos, who apparently heard Officer Maeshiro's explanation to Guzman, also reportedly remarked, "[Y]eah, yeah, yeah, every time we get one new officer he makes threats." At some point, according to affidavits submitted by Guzman and Spain, the picketers asked Officer Maeshiro "to speak with a sergeant about the previous picket line procedures [but] Officer Maeshiro refused."[4]

Officer Maeshiro reported he called for a break during the first set of three revolutions "when cars started to back up ... half dozen or so on each direction[.]" On cross-examination, Officer Maeshiro indicated there may have been four to six cars. When the picketers did not respond to his call, Officer Maeshiro repeated his call for a break "to make sure they heard [him,]" and again the picketers did not break. In his written report, he recounted that at that point, "various picketers stated, 'We know our rights as picketers[;] ... we have two minutes ... [.]' 'We have an agreement with your department.'" Officer Maeshiro testified on cross-examina-

---

3. The manual's purposes are to (1) "explain the [HPD]'s policy in policing labor[-]management disputes"; (2) "specify the responsibilities of particular departmental elements and personnel in these disputes"; and (3) "provide officers with basic guidelines to follow in dealing with disputes." The manual includes the statutes considered to be "most apposite" to labor-management disputes, including HRS § 852–1, concerning "[r]efusal to provide ingress or egress."

4. In orally ruling on Defendants' motions, the court observed, in apparent reference to Officer Russell Maeshiro (Officer. Maeshiro), that "[o]n the surface it looks like we've got somebody who's tired and not too sharp coming off of the job and saying it's my way or the highway and arresting everybody." We express no opinion about this statement by the court. However, while Officer Maeshiro did not expressly admit that he was asked to contact a sergeant, he did not dispute this assertion.

tion that these statements "didn't mean anything to [him]." [5]

According to Officer Maeshiro, he "explained to [Guzman] that [the picketers were] not following directions and stuff and [Guzman] should go talk to them and that this was their first and last warning. After this [Officer Maeshiro said he would] take strict enforcement action." Guzman responded to Officer Maeshiro that "they know what they're doing." The cars that had been "back[ed] up" on Liliha Street apparently passed through the hospital driveway before the second set of revolutions began.

At approximately 6:36 a.m., after the second set of revolutions began, Officer Maeshiro noticed several cars lining up on Liliha Street again, which concerned him because "if the cars back up too far over there people coming around the curve might end up rear ending somebody." He acknowledged that the cars did not "cause a problem . . . at that time," but believed they were "creating a hazard[.]" Officer Maeshiro thus called for another break, but "[n]obody responded" except for saying, "We know what we're doing[;] we got [sic] couple minutes."

Officer Maeshiro testified that he "called dispatch on my radio for a report number[,] . . . figur[ing] if [the picketers] can hear me loud enough call for a report number maybe they'll comply." After this call, he called for a "blue and white." At 6:45 a.m., approximately fifteen minutes after taking his post, he "approached the picketers to explain to them that they were gonna [sic] be placed under arrest for refusal to provide ingress and he [sic] egress" and then, with assistance from Officer A. Togami, placed Defendants under arrest. At the time of the arrest, Officer Maeshiro knew of no complaints by the hospital about the picketing, or of any

emergency vehicles being impeded, and conceded that it was a peaceful "picket."

After Defendants were "bailed out" that day, they returned to the picket line and increased the number of revolutions from three to four. The strike post notations for the period of time after 7:00 a.m. on May 31, 1996 indicated the following: "No incidents on the Day Watch shift. The picketers were given a reasonable time to walk the picket line. Emergency vehicles were not hindered. Traffic was monitored by the officers." The picketers used the four-revolution procedure without incident from May 31, 1996, after the arrests, until July 15, 1996, some six-and-one-half weeks later when the strike ended.

**B.**

In the complaint against Defendants, filed June 26, 1996, the State of Hawai'i (the State) charged them with violating HRS § 852-1:

> On or about the 31st day of May, 1996, in the City and County of Honolulu, State of [Hawai'i], [Defendants] obstructed ingress to or egress from any public or private place in such a manner as not to leave a free passageway for persons and vehicles lawfully seeking to enter or leave such place and [Defendants] did refuse or willfully fail to move as directed by any police or peace officer so as to provide and maintain a free and unobstructed passageway for persons and vehicles lawfully going into or out of a public or private place, thereby committing the offense of Refusal to Provide Ingress or Egress in violation of [HRS § 852-1 [6]].

On July 25, 1996, Defendants moved to dismiss the indictment or, alternatively, for a bill of particulars, pursuant to Hawai'i Rules of Penal Procedure Rules 7(g) and 47.[7] The

---

**5.** The following exchange occurred during the cross-examination of Officer Maeshiro:

> [DEFENDANTS' COUNSEL:] . . . [S]o you've led us to believe that the only references [sic] [the picketers] made was we got two minutes and that meant nothing to you, correct?
> [OFFICER MAESHIRO:] It still didn't mean anything to me.
> [DEFENDANTS' COUNSEL:] *The fact they said we have an agreement with your department meant nothing to you, isn't that correct?*

> [OFFICER MAESHIRO:] *Yes.* ·
> (Emphases added:)

**6.** *See infra* part III.A.

**7.** Defendants moved to dismiss the complaint "for its failure to allege each material element and fail[ure] to describe the offense charged with specificity sufficient to enable Defendants to prepare defenses and to protect against future jeopardy." Alternatively, Defendants requested a bill of particulars, specifying

State filed a memorandum in opposition to this motion on August 8, 1996. The court orally denied this motion on September 13, 1996.

On October 14, 1996, Defendants filed two motions to dismiss the complaint. In the first of these motions, Defendants contended that HRS § 852-1 was preempted by the NLRA. In the second, they argued that HRS § 852-1 was unconstitutional on its face and as applied to Defendants. Defendants later submitted a supplemental supporting memorandum to "further explain the principles governing 'as applied' review[.]"

The court held a hearing on Defendants' motions on November 4, 1996. That same day, the State filed its opposition memorandum, but the court refused to consider it. The court orally denied both of Defendants' motions at the hearing. In doing so, it found that there was in "fact ... a[n] arrangement between the police and the picketers" but that it was an "agreement to refrain from ... strict enforcement in certain cases[.]"

On January 10, 1997, the court entered its written findings of fact, conclusions of law, and order denying Defendants' motions to dismiss the complaint.[8] It concluded that HRS § 852-1 was not void for vagueness, not unconstitutional as applied, and not preempted by the NLRA.

At the conclusion of the hearing denying Defendants' motions to dismiss, Defendants moved, pursuant to HRS § 641-17 (1993), for leave to file an interlocutory appeal of the court's order denying the motions. The court orally granted this motion,[9] and en-

tered a written order to that effect on February 3, 1997.

On February 7, 1997, Defendants filed their notice of appeal from the interlocutory order denying their motions to dismiss.

## II.

Defendants present on appeal the same arguments on which they based their motions to dismiss the complaint: (1) HRS § 852-1 is unconstitutional on its face because it is void for vagueness and "chills" the free expression of viewpoints; (2) the statute is unconstitutional as applied to Defendants, who were "peaceful[ly]" picketing and adhering to an "appropriate" procedure agreed to by the HPD; and (3) the statute is preempted by the NLRA.

## III.

■ We address, first, the issue of whether HRS § 852-1 violates the due process clauses of the United States and Hawai'i Constitutions[10] because it is void for vagueness. The court's ruling on the constitutionality of HRS § 852-1 is a question of law reviewed under the right/wrong standard. *See State v. Gaylord,* 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995) (citations omitted). We hold that the court was correct in concluding that HRS § 852-1 is not void for vagueness and is constitutional on its face.

### A.

(1) where the alleged obstruction occurred; (2) whether the alleged obstruction was a public or private place; (3) the definition of "free passageway"; (4) whether "persons" or "vehicles" or "persons and vehicles" were prevented from having a "free passageway"; (5) the definition of "obstruction"; (6) whether the alleged obstruction was for an ingress or egress, all as set forth in the complaint; (7) which *specific police or peace officer directed* Defendants to move; (8) what the specific directed [sic] was; and (9) whether Defendants either "refused" or "willfully fail[ed]" to move[.]"

8. The same findings of fact, conclusions of law, and order denying Defendants' motions to dismiss the complaint were filed again on January

24, 1997. There is no explanation in the record as to why they were filed twice.

9. Although it objected to Defendants' motion for leave to file an interlocutory appeal, the State apparently did not respond to the court's questioning as to the basis for the objection. On appeal, the State does not challenge the interlocutory nature of the appeal.

10. Article 1, section 5 of the Hawai'i Constitution states, in relevant part: "No person shall be deprived of life, liberty or property without due process of law...."

Defendants apparently relied on both the U.S. Constitution and the Hawai'i Constitution in one of their October 14, 1996 motions to dismiss the indictments.

HRS chapter 852 (1993) [11] provides:

§ 852–1 Refusal to provide ingress or egress; penalty. Whenever ingress to or egress from any public or private place is obstructed by any person or persons in such manner as not to leave a free passageway for persons and vehicles lawfully seeking to enter or leave such place, any police or other peace officer shall direct such person or persons to move so as to provide and maintain a free and unobstructed passageway for persons and vehicles lawfully going into or out of such place. It shall be unlawful for any person to refuse or wilfully fail to move as directed by such officer.

§ 852–2 Penalty. Any person who refuses or wilfully fails to move as directed by such officer shall be fined not more than $200 or imprisoned not more than six months, or both.

■ In determining whether the statute is vague, we are guided by the following principle:

Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudging guilt, or the statute is void for vagueness. Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.

. . . .

[A] criminal statute is void for vagueness unless: it (1) gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly; and (2) provides ex-

plicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delegation of basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.

*Gaylord,* 78 Hawai'i at 138, 890 P.2d at 1178 (citations, internal quotation marks, and brackets omitted).

### B.

■ HRS § 852–1 satisfies the first prong of the above test because that part of the statute describing criminal liability states that it "shall be unlawful for any person to refuse or wilfully fail to move as directed by" the police. We conclude that this part of the statute is unambiguous and describes the offense of failing to move as directed in "narrow and specific terms." *See Cox v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) [12] (holding that a breach of the peace statute was overbroad and unconstitutionally vague, but noting that the element of the statute regarding "refusal to move on after having been ordered to do so by a law enforcement officer" was "narrow and specific"); *State v. Kapela,* 82 Hawai'i 381, 392, 922 P.2d 994, 1005 (App.1996) (observing that a statute providing that "[i]t shall be unlawful for any person . . . to refuse compliance with the lawful order of a police officer" would not be void for vagueness under the first part of the *Gaylord* test). Thus, this aspect of the statute does "give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct." *Gaylord,* 78

---

**11.** The 1993 codification of HRS chapter 852 has not been amended, and thus was in effect when Defendants were arrested on May 31, 1996.

**12.** In that case, the U.S. Supreme Court addressed a defendant's appeals from convictions of disturbing the peace, obstructing public passages, and picketing near a courthouse; the majority opinion addressing the appeal of the disturbing the peace and obstructing public passages convictions is set forth in *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and the majority opinion addressing the appeal of the picketing near a courthouse conviction is set forth in *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

The concurring and dissenting opinions are set forth at 379 U.S. 575, 585, 591, 85 S.Ct. 466, 13 L.Ed.2d 487. For ease of reference, we cite to all of these opinions, as applicable, as *Cox,* 379 U.S. at ——, throughout our discussion.

*Cox* is persuasive authority in interpreting the Hawai'i Constitution because the due process clause of the Hawai'i Constitution is similar to the fourteenth amendment to the United States Constitution. We observe, however, that "the due process protection under our state constitution is not necessarily limited to that provided by the United States Constitution." *State v. Bowe,* 77 Hawai'i 51, 58, 881 P.2d 538, 545 (1994).

Hawai'i at 138, 890 P.2d at 1178 (citations omitted). Furthermore, HRS § 852–2 provides for a penalty to be imposed on "[a]ny person who refuses or wilfully fails to move as directed by such officer[.]"

We conclude, then, that a person of ordinary intelligence would have a reasonable opportunity to know that it is unlawful "to refuse or wilfully fail to move as directed by [a police or other peace] officer." HRS § 852–1. Knowing this, such a person may then choose between the lawful conduct of "mov[ing] as directed" by the officer or the unlawful conduct of "refus[ing] or wilfully fail[ing] to move as directed." *Id.* The first prong of the test set forth in *Gaylord*, therefore, is satisfied.

## C.

Whether the second prong of the *Gaylord* test is met presents a closer question, but we conclude that HRS § 852–1 does "provide[ ] [sufficiently] explicit standards for those who apply" it. *Gaylord*, 78 Hawai'i at 138, 890 P.2d at 1178 (citations and internal quotation marks omitted).

### 1.

We find the U.S. Supreme Court's treatment of a similar statute in *Cameron v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, *reh'g denied*, 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887 (1968), to be persuasive in this case.[13] In *Cameron*, the defendants urged the Court to declare Mississippi's "Anti–Picketing Law" unconstitutionally vague. *Id.* at 615–17, 88 S.Ct. 1335. The statute provided, in relevant part:

> It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations *in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises*, State property, county or municipal courthouses, city halls, office buildings, jails, or other public buildings or property owned by the State of Mississippi, or any county or municipal government located therein, or with the transaction of public business or administration of justice therein or thereon conducted *or so as to obstruct or unreasonably interfere with free use of public streets, sidewalks, or other public ways adjacent or contiguous thereto.*

*Id.* at 612 n. 1, 88 S.Ct. 1335 (emphases added). Focusing on the fact that "the statute prohibits only picketing ... in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from" county courthouses, the U.S. Supreme Court rejected the defendants' contention, and held that "the terms 'obstruct' and 'unreasonably interfere' plainly require no guessing at their

<hr/>

**13.** In addition to citing *Cameron v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, *reh'g denied*, 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887 (1968), the State relies on *Cox* to argue that HRS § 852–1 is not void for vagueness. As mentioned previously, *see supra* note 12, the defendant in *Cox* was convicted of disturbing the peace, obstructing public passages, and picketing near a courthouse. *Cox*, 379 U.S. at 537–38, 85 S.Ct. 453. In its answering brief, the State appears to focus on the U.S. Supreme Court's discussion of Louisiana's picketing statute, which prohibited "picket[ing] or parad[ing] in or near a building housing a court of the State of Louisiana." *Id.* at 560, 85 S.Ct. 476. The Court rejected the argument that the absence of a definition of the term "near" in the statute rendered it unconstitutionally vague:

> [I]t is clear that the statute, with respect to the determination of how near the courthouse a particular demonstration can be, *foresees a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it.* ... This adminis-

trative discretion to construe the term "near" concerns a limited control of the streets and other areas in the immediate vicinity of the courthouse and is the type of narrow discretion which this Court has recognized as the proper role of responsible officials in making determinations concerning time, place, duration, and manner of demonstrations. It is not the type of unbridled discretion which would allow an official to pick and choose among expressions of view the ones he will permit to use the streets and other public facilities....

*Id.* at 568, 85 S.Ct. 476 (citations omitted) (emphasis added). Similarly, the phrase "obstruct[ ] ... in such manner as not to leave a free passageway[,]" HRS § 852–1, requires "a degree of on-the-spot administrative interpretation[,]" *Cox*, 379 U.S. at 568–69, 85 S.Ct. 476, by police or other peace officers who must determine whether to "direct" obstructing parties "to move so as to provide and maintain a free and unobstructed passageway for persons and vehicles lawfully going into or out of" a public or private place, HRS § 852–1.

meaning." *Id.* at 616, 88 S.Ct. 1335 (brackets and some internal quotation marks omitted). Furthermore, it concluded that the law "clearly and precisely delineate[d] its reach in words of common understanding." *Id.* (footnote omitted).

Defendants contend that the statute at issue in *Cameron* may be distinguished from HRS § 852–1 in three ways. First, Defendants point out that the Mississippi statute was limited to the obstruction or unreasonable interference with "any public premises," *id.* at 612 n. 1, 88 S.Ct. 1335, while HRS § 852–1 concerns "ingress to or egress from any public or private place[,]" HRS § 852–1. We do not believe the phrasing of HRS § 852–1, encompassing "any public or private place[,]" renders the statute more susceptible to arbitrary or ad hoc enforcement than a statute concerning only "any public premises."

Second, Defendants construe the Mississippi statute to prohibit only that conduct causing an "unreasonable interference" with access to certain public premises, not conduct causing "a temporary impediment." This construction, however, appears counter to the plain language of the statute, which prohibits "picketing or mass demonstrations in such a manner as to obstruct *or* unreasonably interfere with free ingress or egress to and from any public premises[.]" *Cameron*, 390 U.S. at 612 n. 1, 88 S.Ct. 1335 (emphasis added). By stating that "[t]he terms 'obstruct' *and* 'unreasonably interfere' plainly require no guessing at their meaning[,]" the Court in *Cameron* apparently concluded that the term "obstruct" *by itself* was a "word[ ] of common understanding." *Id.* at 616, 88 S.Ct. 1335 (some internal quotation marks and brackets omitted) (emphasis added).

Finally, Defendants argue that because HRS § 852–1 makes it unlawful for a person "to refuse or wilfully fail to move as directed" by a police or other peace officer, the statute "invites and indeed requires the police officer to make a subjective *ad hoc* determination and impose[s] that on-the-spot interpretation of HRS [§ ] 852–1 on the picketers." However, we believe that the statute essentially

"invites and indeed requires" police officers to determine if it is being violated; with respect to the statute at issue in *Cameron,* the police would have had to make the determination as to whether picketing was being conducted "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to or from any public premises[,]" *Cameron,* 390 U.S. at 612 n. 1, 88 S.Ct. 1335, so as to constitute a violation of the statute, and a need for an arrest. As such, we do not believe *Cameron* is materially distinguishable from the present case.

2.

We observe that the holding in *Cameron* comports with the U.S. Supreme Court's earlier decision in *Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), which is also instructive in this case. The city ordinance at issue in *Shuttlesworth* sets forth two separate offenses, making it unlawful (1) "to so stand, loiter or walk upon any street or sidewalk in the city as to obstruct free passage over, on or along said street or sidewalk[,]" and (2) "to stand or loiter upon any street or sidewalk of the city after having been requested by any police officer to move on." *Id.* at 88, 86 S.Ct. 211. The Court observed that the ordinance, "literally read," would permit a person to stand on a public sidewalk "only at the whim of any police officer" and thus " '[would] not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policemen on his beat.' " *Id.* at 90, 86 S.Ct. 211 (quoting *Cox,* 379 U.S. at 579, 85 S.Ct. 466 (Black, J., concurring in part and dissenting in part)).

However, because the Alabama Court of Appeals had provided a limiting construction to the ordinance such that it "applie[d] only when a person who stands, loiters, or walks on a street or sidewalk *so as to obstruct free passage refuses to obey a request by an officer to move on* [,]" the U.S. Supreme Court held that "[a]s so construed, we cannot say the ordinance is unconstitutional[.]" [14]

---

14. We note that the Court then observed that "it requires no great feat of the imagination to envi-

sage situations in which such an ordinance must be unconstitutionally applied." *Shuttlesworth v.*

*Shuttlesworth*, 382 U.S. at 91, 86 S.Ct. 211 (emphasis added). This limiting construction is very similar to the wording of HRS § 852–1, and the holding in *Shuttlesworth* also persuades us that HRS § 852–1 is not void for vagueness.

### D.

■ We cannot agree with Defendants' contention that HRS § 852–1 must be struck down on the basis that it chills free expression. As was said in *Cox*, "[w]e deal in this case not with free speech alone, but with expression mixed with particular conduct." *Cox*, 379 U.S. at 564, 85 S.Ct. 476. Discussing the application of a statute that prohibited the obstruction of public passages, the Court in *Cox* recognized the competing interests of "the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Id.* at 554, 85 S.Ct. 453. The Court explained that

[t]he constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.... Governmental authorities have the duty and responsibility to keep their streets open and available for movement....

We emphatically reject the notion ... that the First and Fourteenth Amendments [of the U.S. Constitution] afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford

*City of Birmingham*, 382 U.S. 87, 91, 86 S.Ct.

to those who communicate ideas by pure speech.

*Id.* at 555, 85 S.Ct. 453.

HRS § 852–1 does not prohibit picketing or the communication of messages altogether; it is specifically aimed at conduct causing an obstruction of ingress to or egress from public or private places in a manner so as not to leave a free passageway for persons seeking ingress to or egress from those places. Individuals may continue to exercise rights guaranteed by the first amendment to the United States Constitution and section 4 to the Hawai'i Constitution, as long as they do not do so in a manner prohibited by HRS § 852–1.

[The statute in *Cameron* did] not prohibit picketing so intertwined [with free expression and association] unless engaged in in a manner which obstructs or unreasonably interferes with ingress or egress to or from the courthouse. *Prohibition of conduct which has this effect does not abridge constitutional liberty since such activity bears no necessary relationship to the freedom to [. . .] distribute information or opinion.*

*Cameron*, 390 U.S. at 617, 88 S.Ct. 1335 (internal quotation marks and citation omitted) (emphasis added). Hence, we cannot conclude that any chilling effect that HRS § 852–1 *may* have on the exercise of these rights warrants striking down a statute which is designed "to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use[.]" *Cox*, 379 U.S. at 554, 85 S.Ct. 453.

### IV.

In their motions to dismiss below, Defendants essentially claimed HRS § 852–1 was unconstitutionally applied because their right to free speech was infringed and they were subjected to selective enforcement of the statute.

On appeal, Defendants additionally contend that "Officer Maeshiro's refusal to acknowledge and respect the agreement constitutes an [i]ndefensible entrapment of [Defendants,] who were · conducting them-

211, 15 L.Ed.2d 176 (1965).

selves in accordance with what they were led to believe by [the HPD] was allowable picketing procedure." Defendants further maintain that they, like the defendant in *Cox,* "relied on assurances from representatives of the [police] that their three-revolution picket procedure ... was not a violation of any law."

■ In our view, these contentions raise what has become known as an entrapment by estoppel defense. We hold that an entrapment by estoppel defense is independently afforded by the due process clause of the Hawai'i Constitution. While we hold that the defense may be raised under the Hawai'i Constitution, we recognize that the defense originated in U.S. Supreme Court cases interpreting the due process clause of the U.S. Constitution.[15]

### A.

■ Two U.S. Supreme Court decisions, *Raley v. Ohio,* 360 U.S. 423, 426, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), and the *Cox* decision regarding picketing near a courthouse, are frequently cited as providing the basis for an affirmative defense that has become known as "entrapment by estoppel." *See, e.g., United States v. West Indies Transport,* 127 F.3d 299, 311 (3d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 700, 139 L.Ed.2d 644 (1998); *United States v. Aquino–Chacon,* 109 F.3d 936, 938 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997); *United States v. Howell,* 37 F.3d 1197, 1204 (7th Cir.1994), *cert. denied,* 514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995); *United States v. Smith,* 940 F.2d 710, 714 (1st Cir.1991); *United States v. Tallmadge,* 829 F.2d 767, 773 (9th Cir.1987). "The underlying concept" of the entrapment by estoppel defense drawn from *Raley* and *Cox* "is that, under certain circumstances, an individual may be entitled to reasonably rely on the representations of an authorized government official as to the legality of his [or her] conduct." *Smith,* 940

F.2d at 714. It is important to note that the entrapment by estoppel defense "is predicated upon fundamental notions of fairness embodied in the ... due process clause [of the fifth amendment to the U.S. Constitution]." *Id.* An examination of *Raley* and *Cox* is illustrative.

### 1.

In *Raley,* several witnesses before the Ohio Un–American Activities Commission invoked their constitutional privilege against self-incrimination when they refused to answer the commissioners' questions, after being assured by the commissioners that such a privilege was available. *Raley,* 360 U.S. at 425, 79 S.Ct. 1257. However, an Ohio immunity statute had eliminated the availability of this privilege for persons testifying before a legislative committee. *Id.* at 431, 79 S.Ct. 1257. The defendants were thus charged with and convicted of contempt for failure to answer the commissioners' questions. *Id.* at 424–25, 79 S.Ct. 1257.

The Court reversed the convictions, reasoning that "since the defendants were apprised by the commission at the time they were testifying that they had a right to refuse to answer questions that might incriminate them, they could not possibly in following the admonition of the commission be in contempt of it[.]" *Id.* at 426, 79 S.Ct. 1257 (internal quotation marks and citation omitted). After observing that vague or contradictory criminal statutes violated due process, the Court explained that in *Raley* "there were more than commands simply vague or even contradictory. There was *active misleading.*" *Id.* at 438, 79 S.Ct. 1257 (emphasis added). Moreover, although the commissioners' advice with respect to the privilege was "legally erroneous, ... the fact remain[ed] that at the inquiry they were the voice of the State most presently speaking to the [defendants]." *Id.* at 438–39, 79 S.Ct. 1257 (footnote omitted). Hence, the Court concluded that the due process clause of the

---

**15.** "[I]t is well-established that ... we [must] afford defendants the minimum protection required by the federal constitution[.]" *State v. Lopez,* 78 Hawai'i 433, 445, 896 P.2d 889, 901 (1995). However, we also expressly rest our

opinion on an interpretation of the due process clause of the Hawai'i Constitution, a ground separate and independent from that which may be found in the U.S. Constitution.

U.S. Constitution did not "permit[ ] convictions to be obtained under such circumstances." *Id.* at 439, 79 S.Ct. 1257.

### 2.

In *Cox,* the defendant was convicted of, *inter alia,* picketing near a courthouse in violation of a state statute. *Cox,* 379 U.S. at 538, 85 S.Ct. 453. The relevant statute prohibited picketing near a courthouse but did not define the term "near."[16] *Id.* at 560, 568, 85 S.Ct. 476. The Court noted that some "on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing" the statute was required. *Id.* at 568, 85 S.Ct. 476. Accordingly, the Court reasoned that "[i]t is apparent that demonstrators, such as those involved here, would justifiably tend to rely on this administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568–69, 85 S.Ct. 476.

The record showed that the police had given permission to the demonstrators, including the defendant, to hold their meeting at a certain distance from the courthouse. *Id.* at 569, 85 S.Ct. 476. The Court concluded that the police, in designating the area in which the demonstrators could congregate, had effectively "advised [the defendant] that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute." *Id.* at 571, 85 S.Ct. 476. The Court therefore determined that the defendant's subsequent conviction for violating the picketing statute would violate due process:

> [U]nder all the circumstances of this case, after the public officials acted as they did, to sustain [the defendant's] later conviction for demonstrating where they told him he could "would be to sanction an indefensible sort of entrapment by the State—*convicting a citizen for exercising a privilege which the State had clearly told him was available to him." The Due Process Clause [of the U.S. Constitution] does not*

*permit convictions to be obtained under such circumstances.*

*Id.* (quoting *Raley,* 360 U.S. at 426, 79 S.Ct. 1257) (emphasis added).

### B.

The Supreme Court's decisions in *Raley* and *Cox* were characterized as calling into doubt "[t]he solidly entrenched, though little discussed, judicial principle that the government cannot be estopped in criminal actions[.]" *Applying Estoppel Principles in Criminal Cases,* 78 Yale L.J. 1046, 1046 (1969). "The development of a full-blown defense of criminal estoppel[,]" it was then argued, "would bear two interrelated advantages for a rational system of criminal justice": (1) "assur[ing] a decent standard of fairness for citizens who detrimentally rely on official misrepresentations[,]" and (2) "provid[ing] an adequate standard for judicial review of the broad executive discretion granted to the administrators of the criminal law." *Id.* at 1073.

Of particular significance to the instant case, the commentator asserted that a criminal estoppel defense would effectively ameliorate problems caused by criminal statutes requiring administrative interpretation and by statutes aimed at maintaining "public order." *Id.* at 1054, 1061–62. First, it was noted that "[l]egislatures continually pass criminal statutes that require interpretation[,]" such as the picketing statute at issue in *Cox. Id.* at 1054. Consequently,

> [a]n individual, confronted with the practices and views of the enforcement agency, has little means of discovering whether the prosecutor—much less the legislature— knows or agrees with how the law is being administered. In light of such state-sponsored confusion, government insistence that the citizen should know the true state of the law is at best unreasonable.

*Id.* Estoppel in a criminal case thus would serve to "protect[ ] . . . those whom the government has confused as to the state of the law[.]" *Id.* at 1058. Second, in cases involving violations of "public order" statutes,

---

**16.** We express no opinion as to whether the term "near" would satisfy due process standards under the Hawai'i Constitution.

"[e]ntertaining an estoppel defense to charges like these would not only import more fairness into the criminal process, but would reduce undesirable chilling effects of the substantive law." *Id.* at 1061–62.

### C.

Citing the above article with approval, the U.S. Supreme Court applied the rationale of *Raley* and *Cox* to a claim of reliance on regulations promulgated by the Army Corps of Engineers, and again emphasized the need to uphold "traditional notions of fairness inherent in our system of criminal justice." *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 674, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). The regulations at issue had construed a federal statute concerning waterways as prohibiting only those water deposits that affected navigation, as opposed to all foreign deposits in navigable waters. *Id.* at 672–73, 93 S.Ct. 1804. Although it affirmed that the statute applied to all unauthorized foreign deposits, the Court held that the trial court erred in not permitting the defendant to "present evidence in support of its claim that it had been affirmatively misled into believing that the discharges in question were not a violation of the statute." *Id.* at 670, 675, 93 S.Ct. 1804. The Court expressed its concern for providing "fair warning" to citizens "as to what conduct the Government intended to make criminal":

> Of course, there can be no question that [the defendant] had a right to look to the Corps of Engineers' regulations for guidance. The Corps is the responsible administrative agency under the [statute], and [its rulings, interpretations, and opinions] do constitute a body of experience and informed judgment to which ... litigants may properly resort for guidance. Moreover, although the regulations did not of themselves purport to create or define the

statutory offense in question, it is certainly true that their designed purpose was to guide persons as to the meaning and requirements of the statute. *Thus, to the extent that the regulations deprived [the defendant] of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution.*

*Id.* at 674, 93 S.Ct. 1804 (emphasis added).

The Court indicated that a defendant claiming it had been affirmatively misled into believing that certain conduct was legal must demonstrate that it actually and reasonably relied on the affirmative misrepresentation. In arguing that the trial court properly barred the defendant from introducing evidence in support of its claim that the regulations were affirmatively misleading, the government maintained that a prior U.S. Supreme Court decision correctly construing the statute "preclude[d] [the defendant] from asserting reliance on the Corps of Engineers' regulations[.]" *Id.* at 674–75, 93 S.Ct. 1804. The Court did not address this contention because it "pertain[ed], not to the issue of the availability of reliance as a defense, but rather to *the issues whether there was in fact reliance and, if so, whether that reliance was reasonable under the circumstances—issues that must be decided in the first instance by the trial court.*" *Id.* at 675, 93 S.Ct. 1804 (emphasis added).

### V.

 Building on this U.S. Supreme Court case law, the federal courts of appeals have established a criminal estoppel defense termed "entrapment by estoppel."[17] Al-

---

**17.** *See, e.g., United States v. West Indies Transport*, 127 F.3d 299 (3d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 700, 139 L.Ed.2d 644 (1998); *United States v. Aquino–Chacon*, 109 F.3d 936 (4th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997); *United States v. Spires*, 79 F.3d 464 (5th Cir.1996); *United States v. Meraz–Valeta*, 26 F.3d 992 (10th Cir.1994); *United States v. Howell*, 37 F.3d 1197 (7th Cir. 1994), *cert. denied*, 514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995); *United States v.*

*Corso*, 20 F.3d 521 (2d Cir.1994); *United States v. Smith*, 940 F.2d 710 (1st Cir.1991); *United States v. Hurst*, 951 F.2d 1490 (6th Cir.1991), *cert. denied*, 504 U.S. 915, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992); *United States v. Austin*, 915 F.2d 363 (8th Cir.1990), *cert. denied*, 499 U.S. 977, 111 S.Ct. 1626, 113 L.Ed.2d 722 (1991); *United States v. Hedges*, 912 F.2d 1397 (11th Cir.1990); *United States v. Hsieh Hui Mei Chen*,

though slightly different formulations of this defense have been put forth, certain common elements have emerged: (1) an affirmative representation that certain conduct is legal;[18] (2) by an authorized government official; (3) which the defendant actually believed and acted upon; (4) in reasonable reliance.

## A.

An affirmative representation that certain conduct is legal is considered necessary by most circuit courts to support a claim of entrapment by estoppel. *Howell,* 37 F.3d at 1204; *see United States v. Brebner,* 951 F.2d 1017, 1025–26 (9th Cir.1991) ("To invoke estoppel against the Government, the party claiming estoppel must show affirmative misconduct as opposed to mere misleading.") (internal quotation marks and citation omitted). It is often said that an official must have "told the defendant that certain criminal conduct was legal," *West Indies Transport,* 127 F.3d at 313, or "assure[d] a defendant that certain conduct is legal," *Smith,* 940 F.2d at 714. *See also United States v. Spires,* 79 F.3d 464, 466 (5th Cir.1996) ("ac-

tively assures a defendant that certain conduct is legal"); *United States v. Hurst,* 951 F.2d 1490, 1499 (6th Cir.1991) ("tells the defendant that the particular conduct is legal"), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992); *United States v. Austin,* 915 F.2d 363, 366 (8th Cir.1990) ("tells the defendant that certain conduct is legal"), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1626, 113 L.Ed.2d 722 (1991) (internal quotation marks and citation omitted); *United States v. Hedges,* 912 F.2d 1397, 1405 (11th Cir.1990) ("tells a defendant that certain conduct is legal").

On the other hand, the U.S. Court of Appeals for the Second Circuit has indicated that it may be sufficient if an official "effectively communicates an assurance that the defendant is acting under authorization[.]" *United States v. Abcasis,* 45 F.3d 39, 43 (2d Cir.1995). In a similar vein, another court has held that the entrapment by estoppel defense "is implicated where a government official misleads a party as to the legality of certain conduct[.]" *United States v. Meraz–Valeta,* 26 F.3d 992, 996 (10th Cir.1994).

754 F.2d 817 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).

**18.** Although courts discussing the elements of entrapment by estoppel have referred to this element as an "affirmative *mis*representation" or "affirmatively *mis*leading," we believe that the term "affirmative *representation*" is more inclusive of the potential situations in which the entrapment by estoppel defense may be raised. In many entrapment by estoppel cases, it is true that a representation of law by an authorized official will be a misrepresentation, as in a case involving a federal firearm offense where the representation as to the defendant's ability under federal law to own a firearm was clearly mistaken. *See, e.g., United States v. Tallmadge,* 829 F.2d 767, 775 (9th Cir.1987).

However, as *Cox* illustrates, sometimes the representation of law is not necessarily a mistaken or false interpretation. In *Cox,* the U.S. Supreme Court characterized the official's grant of permission to hold a demonstration at a certain distance away from the courthouse as an "on-the-spot administrative interpretation" of the term "near" by an official "charged with the responsibility for administering and enforcing" a statute prohibiting demonstrations "near" a courthouse. *Cox,* 379 U.S. at 568–69, 85 S.Ct. 476. The Court did not indicate that this "administrative interpretation" was mistaken; rather, it stated that "[i]n effect, [the defendant] was advised that a demonstration at the place it was

held would not be one 'near' the courthouse within the terms of the statute." *Id.* at 571, 85 S.Ct. 476.

This rationale also underlies our belief that the affirmative defense contained in HRS § 702–220 (1993), while similar to the due process defense of entrapment by estoppel, does not replace or subsume the latter defense:

> **§ 702–220 Ignorance or mistake of law; belief that conduct not legally prohibited.** In any prosecution, it shall be an affirmative defense that the defendant engaged in the conduct or caused the result alleged under the belief that the conduct or result was not legally prohibited when the defendant acts in reasonable reliance upon an official statement of the law, *afterward determined to be invalid or erroneous,* contained in:
> (1) A statute or other enactment;
> (2) A judicial decision, opinion, or judgment;
> (3) An administrative order or administrative grant of permission; or
> (4) An official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration, or enforcement of the law defining the offense.

(Second emphasis added.) As with the term "affirmative misrepresentation," the statute's requirement that the official statement of law be "invalid or erroneous" would not include a situation such as the one presented in *Cox.*

It is apparent, however, that "simply fail[ing] to enforce the law" cannot give rise to an entrapment by estoppel defense. *Hurst*, 951 F.2d at 1499. It has been emphasized that "mere nonfeasance in law enforcement" cannot be considered "tantamount to official approval of illegal acts and entrapment"; otherwise, "there would be scarcely a speeding ticket not subject to due process challenge." *Id.*

### B.

The U.S. Court of Appeals for the Eighth Circuit has declared that "[i]t is the authority, whether apparent or actual, of the government official that is crucial to the entrapment by estoppel defense." *Austin*, 915 F.2d at 366. Other courts have agreed that, in order for a defendant to rely on entrapment by estoppel, the official making the representation about a statute must be authorized to interpret that statute. *See, e.g., Spires*, 79 F.3d at 466 ("To satisfy the requirements of the defense when charged with a federal crime, a defendant is required to show reliance either on a federal government official empowered to render the claimed erroneous advice, or on an authorized agent of the federal government who has been granted the authority from the federal government to render such advice."); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir.1994); *Howell*, 37 F.3d at 1204; *Smith*, 940 F.2d at 714; *Hedges*, 912 F.2d at 1404. For example, a state official's statement or interpretation of a state or federal law could not serve as a basis for an entrapment by estoppel defense to a charged violation of a federal law. *See Hurst*, 951 F.2d at 1499.

In *West Indies Transport*, the U.S. Court of Appeals for the Third Circuit did not explicitly require that the government official be authorized to give the interpretation or representation. *West Indies Transport*, 127 F.3d at 313. It indicated, however, that "the identity of the government official" might properly be considered in determining the reasonableness of a defendant's reliance on the official's statement. *Id.*

### C.

It is widely agreed that a defendant asserting an entrapment by estoppel defense must have actually believed and acted upon the official's representation. This requirement is commonly stated in terms of the defendant actually relying upon and/or "believing" the representation. *See, e.g., id.* (requiring actual reliance); *Spires*, 79 F.3d at 466 (requiring that the defendant rely on the advice and "continue[ ] or initiate[ ] the conduct"); *Abcasis*, 45 F.3d at 43 (requiring reliance); *Howell*, 37 F.3d at 1205 (requiring that the defendant believe and rely on the official's advice); *Smith*, 940 F.2d at 714 (requiring that the defendant rely on the advice and "continue[ ] or initiate[ ] the conduct"); *Brebner*, 951 F.2d at 1026 (requiring actual reliance); *Tallmadge*, 829 F.2d at 773 (requiring that the defendant believe the official).[19]

---

19. While the state of mind of a defendant raising the entrapment by estoppel defense is relevant insofar as the defendant must have actually believed and acted in reliance on an official representation, several courts have held that the defendant's state of mind is *not* relevant in another sense. These courts have emphasized that the entrapment by estoppel defense "rests upon principles of fairness rather than the defendant's mental state and thus it may be raised even in strict liability offense cases." *Hedges*, 912 F.2d at 1405.

In other words, even if absence of criminal intent is not a defense to a charge, a defendant may raise the defense of entrapment by estoppel. *See Abcasis*, 45 F.3d at 44 ("The defense of entrapment by estoppel does not depend solely on absence of criminal intent."); *Spires*, 79 F.3d at 466 ("The focus of the inquiry [with an entrapment by estoppel defense] is on the conduct of the government not the intent of the accused.");

*Smith*, 940 F.2d at 714 (concluding that although the defendant's "personal belief as to the legality of his conduct was irrelevant under the statute" because "the government need only prove that [the defendant] knew he possessed the firearms, not that he understood that such possession was illegal[,]" the entrapment by estoppel defense required the court "to focus on the conduct of the government official rather than on the state of mind of the defendant"); *Tallmadge*, 829 F.2d at 773 (holding that although the trial court rejected a defendant's "state of mind-due process defense on the ground that scienter is not a defense" to certain federal firearms offenses, the circumstances of the case satisfied the elements of entrapment by estoppel and thus the defendant's conviction for those offenses should be reversed). The rationale behind these decisions is apparently that the defense of entrapment by estoppel "depends on the unfairness of prosecuting one who has been led by the conduct of

### D.

Finally, our research has not revealed any decision that does not require the defendant's reliance to be *reasonable*. *See Howell*, 37 F.3d at 1204 ("[A] common thread in the case law applying the [entrapment by estoppel] defense is . . . reasonable reliance . . . by a defendant[.]"). Courts explaining the term "reasonable reliance" have adopted an objective standard, stating that the reasonableness of the reliance is determined by considering whether "'a person sincerely desirous of obeying the law ·would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *Brebner*, 951 F.2d at 1025–26 (quoting *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir.1970)) (internal quotation marks added). *See also West Indies Transport*, 127 F.3d at 313 n. 13 (adopting this definition of "reasonable reliance"); *Abcasis*, 45 F.3d at 44 (defining "reasonable reliance" in this way).

The courts in *West Indies Transport* and *Abcasis* also stated that a defendant claiming entrapment by estoppel must have had a "mistaken but reasonable, *good faith* belief that he [or she] has in fact been authorized" to engage in the conduct. *Abcasis*, 45 F.3d at 43 (emphasis added); *see West Indies Transport*, 127 F.3d at 313 (mandating that the defendant's reliance be "in good faith and reasonable"). While the use of the phrase "good faith" at first glance implies a subjective standard for determining the reasonableness of a defendant's reliance, these courts have, as noted above, concluded that reasonableness must be determined with reference to a person "sincerely desirous of obeying the law." *West Indies Transport*, 127 F.3d at 313 n. 13; *Abcasis*, 45 F.3d at 44. Hence, in our view, the reasonableness of a defendant's reliance must be measured by an objective standard.

### E.

We recognize that entrapment by estoppel "is a defense that is rarely applicable." *Howell*, 37 F.3d at 1204. It has been characterized as "a narrow exception to the general rule that ignorance of the law is no excuse[.]" *Spires*, 79 F.3d at 466. The dissenting opinion in *Tallmadge* emphasized that it is necessary to construe the entrapment by estoppel defense narrowly "because [the defense] 'permit[s] the individual officer to alter or suspend the statutory penal law simply by misinterpreting it.'" *Tallmadge*, 829 F.2d at 776 (quoting *Applying Estoppel Principles in Criminal Cases, supra*, at 1052)[20] (some brackets added). Consequently, the *Tallmadge* dissent observed, a defendant "must

government agents to believe his [or her] acts were authorized." *Abcasis*, 45 F.3d at 44.

**20.** The statement quoted from *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046, 1052 (1969), was made by the commentator in discussing the separation of powers rationale for rejecting estoppel in criminal cases. The commentator observed that "[t]he interests embodied in the criminal law are *public* interests of the greatest weight. No official or agency of government has the authority to waive the public interest, and none—save the legislature—can define the limits of the criminal law." *Id.* at 1051–52 (emphasis in original). Nevertheless, it was argued that the effective "alter[ation] or suspen[sion of] the statutory penal law" by an official interpreting the law should be permitted in certain circumstances:

Justifying the rule against estopping the government in terms of separation of powers, however, is only a formal expression of the belief that the criminal law is too serious a matter to allow law enforcement officials to make mistakes as to what it covers. If the individual is unsure where the boundary of lawful conduct lies, he [or she] should steer wide of the unlawful zone rather than seek official advice as to how far he [or she] might legally go. This makes a great deal of sense where the prohibited conduct threatens grave injury to persons or property or a serious disruption of the economy, but the no-estoppel rule has traditionally been applied without regard to the gravity of the offense and its probable consequences. The criminal law has become extensively used as an instrument of social control with a complex, sometimes labyrinthian administrative structure. Where an individual has relied upon the enforcement agency's interpretation of a highly technical law, or *obeyed the reasonable order of someone with apparent authority to give it, allowing the government to disclaim the action of its agent seems not only unjust, but unnecessary to the proper functioning of the criminal process and to any rational theory of the allocation of power between different branches of government.*

*Id.* at 1052–53 (internal quotation marks and footnotes omitted) (emphasis added).

establish very clearly" the elements of the entrapment by estoppel defense. *Id.*

## VI.

One Hawai'i case indicates that the doctrine of estoppel may not be used against the State in the enforcement of police measures, including laws "to promote the order, safety, health, morals, and general welfare of society":

> Apparently both court and counsel have overlooked the familiar principle of estoppel that a sovereign state is not subject to an estoppel to the same extent as an individual or a private corporation. The doctrine of estoppel is not applied to the extent of impairing sovereign powers of a state such as it exercises, for example, in the enactment and enforcement of police measures.... "Police measures" as used in the foregoing authority undoubtedly refers to that function of government more commonly referred to as police power. Police power has a very wide and varied meaning. A short, concise definition of that term is, "Police power is the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society."

*Godbold v. Manibog,* 36 Haw. 206, 214–15 (some internal quotation marks and citations omitted), *reh'g denied,* 36 Haw. 230 (1942). More recently, however, the Hawai'i Supreme Court reaffirmed that it has "explicitly maintained the validity of the notion that the government can be estopped." *Cudal v. Sunn,* 69 Haw. 336, 346, 742 P.2d 352, 358 (1987) (internal quotation marks, brackets, and citation omitted).

We are not aware of any case law in this jurisdiction that has applied the doctrine of estoppel in criminal cases. However, even if our case law has not specifically considered this, we interpret the due process clause of the Hawai'i Constitution as allowing the entrapment by estoppel defense to be raised. The due process clause in our state constitution, therefore, would be violated under facts establishing the defense of entrapment by estoppel. To that narrow extent, the State may be estopped from pursuing or obtaining a criminal conviction.

## VII.

Although we accept the validity of an entrapment by estoppel defense against the State in criminal cases where the facts warrant, we cannot conclude on the record before us that this defense has been established as a matter of law so as to require that Defendants' motion to dismiss be granted. The defense involves the resolution of factual questions such as "whether there was in fact reliance and, if so, whether that reliance was reasonable under the circumstances[.]" *Pennsylvania Indus. Chem. Corp.,* 411 U.S. at 675, 93 S.Ct. 1804. Such factual questions should be resolved at trial. *Id.*

In their motions to dismiss, Defendants essentially argued that the statute "as applied" infringed on their free speech rights and was selectively enforced. Hence, while they raise the *Cox* case on appeal, Defendants have obviously not had the opportunity to fully develop and present a case based on entrapment by estoppel. Moreover, the specific defense of entrapment by estoppel, and as that defense is formulated herein, was not considered by the court on Defendants' motions to dismiss. Accordingly, on remand, Defendants must be afforded the opportunity at trial to present evidence on this defense.

## VIII.

As a final point, we conclude that the NLRA does not preempt HRS § 852–1. Defendants appear to advance two arguments in support of their contention that HRS § 852–1 is, as a general matter, preempted by the NLRA. We cannot concur in these arguments.

First, Defendants argue that statistics demonstrate HRS § 852–1 "has been used exclusively on picketers, and except for one incident, has been used exclusively on labor picketers[.]" Relying on *Vaca v. Sipes,* 386 U.S. 171, 180, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), Defendants maintain that this practice directly affects the "administration of labor policies." However, it is not clear how and to what extent the "administration of

44

labor policies" was affected by the State's use of HRS § 852–1 in this case.

Second, Defendants assert that "it is arguable that HRS [§ ] 852–1 and the NLRA conflict on the same conduct" and that "where there are two potentially conflicting statutes brought to bear on precisely the same conduct, preemption of state law is appropriate." In *Sears, Roebuck and Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the U.S. Supreme Court concluded that federal law did not deprive a state court of "jurisdiction to entertain Sears'[s] trespass action" against the defendants. *Id.* at 207, 98 S.Ct. 1745. The Court explained that the relevant inquiry in determining whether preemption is appropriate, is "not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to ... or different from ... that which could have been, but was not, presented to the [NLRB]." *Id.* at 197, 98 S.Ct. 1745.

The Court noted that Sears "asserted no claim that the picketing itself violated any state or federal law[;] instead, [i]t sought simply to remove the pickets from its property to the public walkways[.]" *Id.* at 185, 98 S.Ct. 1745. Under these circumstances, the Court determined that "the controversy which Sears might have presented to the [NLRB] [was] not the same as the controversy presented to the state court," and thus, state adjudication of the trespass action "would create no realistic risk of interference with the [NLRB's] primary jurisdiction[.]" *Id.*

In *Sears*, the Court also addressed the issue of whether state court jurisdiction over the trespass action was preempted because the picketing was arguably protected by federal law. The Court concluded that "[b]ecause the assertion of state jurisdiction in a case of this kind does not create a significant risk of prohibition of protected conduct, we are unwilling to presume that Congress intended the arguably protected character of the [defendants'] conduct to deprive the [state] courts of jurisdiction" over the trespass action. *Id.* at 207, 98 S.Ct. 1745 (footnote omitted).

As in *Sears*, in the case before us, the prosecution by the State essentially focused on the location of the picketers. Accordingly, we believe federal law does not preempt state court jurisdiction.

IX.

For the foregoing reasons, the court's January 10, 1997 and January 24, 1997 orders are affirmed, and the case is remanded for trial.