EVERETT KLEINJANS and RICHARD TAKASAKI, Plaintiffs-Appellees, Cross-Appellants, v. PETER LOMBARDI, et al., Defendants-Appellants, Cross-Appellees.

STATE OF HAWAII, Plaintiff-Appellee, Cross-Appellant, v. PETER LOMBARDI, et al., Defendants-Appellants, Cross-Appellees.

No. 4947.

DECEMBER 10, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, AND LEVINSON, JJ.; CIRCUIT JUDGE OGATA FOR KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY LEVINSON, J.

This appeal involves the propriety of using an injunction to prohibit certain forms of student demonstrations and the procedures which must be followed in order to

obtain such relief. The demonstration giving rise to this case began at 2:00 p.m. on May 7, 1969. At that time the defendants entered the office of Chancellor Kleinjans of the East-West Center, located on the Manoa campus of the University of Hawaii. The demonstrators wished to protest the East-West Center's handling of an incident involving a Nationalist Chinese grantee of the Center, Chen Yu-hsi, who had been recalled by his government and imprisoned for allegedly seditious activities. Chancellor Kleinjans arrived at his office at 3:30 p.m., met with the demonstrators for two hours and then left. The demonstrators remained, however, continuing to occupy the chancellor's office. At 11:00 a.m. on May 8 copies of the complaints and temporary restraining orders filed in the circuit court were served upon them. Shortly thereafter the demonstration ended.

The temporary restraining orders which terminated the demonstration were issued in response to the filing of two complaints, both seeking to restrain the defendants permanently from certain activities. The first complaint was filed by the plaintiffs Kleinjans and Takasaki, on behalf of the University of Hawaii, seeking an equitable remedy under HRS § 603-22. The second was filed in the name of the Attorney General for the State of Hawaii, to enjoin the defendants, pursuant to HRS § 603-23, from violating the Hawaii criminal trespass statute. These two suits were consolidated and a hearing was held in the circuit court on the issuance of a permanent injunction.

On September 26, 1969 the circuit court handed down its decision and order. It found that the plaintiffs, in the service of process on certain of the defendants under fictitious names as unknown defendants, had failed to comply with the requirements set forth in H.R.C.P., Rule 17(d), which governs actions against unknown defendants. Consequently, the court dismissed the complaints against the

improperly served defendants. The court also held that the temporary restraining orders were invalid, since the defendants had been unconstitutionally denied the opportunity to participate in the proceedings for their issuance.

Having made these preliminary determinations the trial court went on to grant the relief requested by the plaintiffs Kleinjans and Takasaki, permanently enjoining the remaining defendants from performing certain specified acts which would obstruct the functioning of the East-West Center facilities. In granting this relief the court felt that it had rendered the Attorney General's complaint moot and dismissed it accordingly. Plaintiffs and defendants have taken appeals from the lower court's holdings.

On appeal, the defendants argue that the plaintiffs are not entitled to injunctive relief since they never demonstrated that the legal remedy of arrest was inadequate to protect their interests. The plaintiffs maintain that the trial court erroneously held (1) that the temporary restraining order was constitutionally invalid because of issuance *ex parte* and (2) that H.R.C.P., Rule 17(d) was applicable to this case. We find that the only error below was the holding that the *ex parte* issuance of the temporary restraining order was invalid.

## I. THE PROPRIETY OF GRANTING INJUNCTIVE RELIEF.

### A. *Traditional Equity Theory.*

The trial court found that the occupation of the chancellor's office threatened to interfere with the successful administrative functioning of the East-West Center. The injuries flowing from such interference, resulting as they do in the threatened loss of class time by both students and faculty, are not susceptible to pecuniary valuation. Thus, the plaintiffs were faced with the threat of irrepa-

rable injury and, under traditional equitable principles, the trial court properly sought to enjoin those acts which threatened to cause such injury. *See* 4 Pomeroy, *Equity Jurisprudence,* § 1347 (5th ed. 1941).

In addition, we do not agree with the defendants' contentions that the suitability of injunctive relief in this case is affected by the possible criminal nature of the defendants' conduct. The courts and commentators have long recognized that although equity will not enjoin an act *merely* because it is criminal, an injunction will issue where an individual property right is also threatened or there are other appropriate circumstances.[1] In such circumstances equity acts not to enforce the criminal law but to protect the rights of the individual from irreparable injury. As the New York Court of Appeals explained in *People ex rel. Bennett* v. *Laman,* 277 N.Y. 368, 376, 14 N.E.2d 439, 442 (1938):

> [T]he criminal nature of an act will not deprive equity of jurisdiction that would otherwise attach.... Whether or not the act sought to be enjoined is a crime, is immaterial. Equity does not seek to enjoin it simply because it is a crime; it seeks to protect some proper interest. If the interest sought to be protected is one of which equity will take cognizance, it will not refuse to take jurisdiction on the ground that the act which invades that interest is punishable by the penal statutes of the State.

Thus, under the traditional principles of equity injunctive relief was properly granted. We do not choose, however, to rest our decision on this ground alone. In challenging

---

[1] *See* In re Debs, 158 U.S. 564, 593 (1895) ; People *ex rel.* Bennett v. Laman, 277 N.Y. 368, 376, 14 N.E.2d 439, 442 (1938) ; Auto Rental Co. v. Lee, 35 Haw. 77, 93 (1939) ; 4 Pomeroy, *Equity Jurisprudence,* § 1347 (5th ed. 1941) ; Note, *Developments in the Law—Injunctions,* 78 Harv. L. Rev. 994, 1013-21 (1965) ; Rosenthal, *Injunctive Relief Against Campus Disorders,* 118 U. Pa. L. Rev. 746, 752 (1970).

the use of an injunction in this case, the defendants have raised questions of policy which merit discussion.

### B. *The Policy Considerations Behind Sanctioning the Use of an Injunction in this Case.*[2]

The defendants contend that where the demonstrators' conduct is of a criminal character the use of equity decrees to control it will be futile and ineffective. This is because criminal acts are already prohibited by law and the force of an injunction adds nothing to the prohibition of the statute. If the fear of punishment by the criminal courts will not restrain a defendant's acts, it is argued, neither will fear of punishment by an equity court for contempt. We do not believe, however, that this argument exhausts all of the possibilities. For while it is doubtlessly true that injunctive relief will prove of no avail in restraining those who clearly set out to break the law without any claim of right, it may be of genuine value in resolving conflicts where there is doubt between the parties as to their respective rights. The case at hand provides a good illustration.

In the instant case the defendants initially asserted that their conduct was a legitimate exercise of their right peaceably to assemble and petition for a redress of grievances, and therefore was protected under the first amendment to the U.S. Constitution and article I, section 3 of the Hawaii Constitution. The plaintiffs, on the other hand, argued that the defendants were mere trespassers. In this situa-

---

2 It should be recognized that the limitations on the injunctive remedy are fundamentally questions of policy. Thus, Pomeroy suggests: "Whenever a right exists or is created, by contract, by the ownership of property or otherwise, cognizable by law, *a violation of that right will be prohibited*, unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy." 4 Pomeroy, *supra* note 1 at § 1338. Many of the historical limitations on injunctive relief were based upon considerations of deference to a competing judicial system and deserve to be reevaluated in light of the modern merger of law and equity. *See* Note, *supra* note 1 at 996.

tion the use of the injunctive process was not a futile exercise; it enabled the parties to enjoy the benefits of a form of anticipatory litigation, gaining for them an immediate entry to the judicial process.

For the defendants, the value of a judicial proceeding, as against immediate arrest by the police, is that it provides the most effective means of informing those who wish to stay within the bounds of legally protected expression exactly where that elusive line lies. In addition it provides an immediate opportunity for the parties to resolve their differences peacefully, in accordance with a judicial determination of the question of right and wrong. The wisdom of this course is illustrated in this case by the obedience which followed upon the issuance of the trial court's decision and order. We are not prepared to rule as a matter of law that future defendants, similarly situated, will be less responsive to the workings of the judicial process.[3]

## II. THE CONSTITUTIONALITY OF THE *EX PARTE* ISSUANCE OF THE TEMPORARY RESTRAINING ORDERS IN THIS CASE.

Having decided that the granting of injunctive relief was proper in this case we must next determine whether the decision of the trial court invalidating the *ex parte* temporary restraining orders was constitutionally mandated. In holding the *ex parte* order invalid the circuit court relied on the Supreme Court decision, *Carroll* v. *President and Commissioners of Princess Anne,* 393 U.S. 175 (1968), which prohibited *ex parte* injunctions in the

---

[3] The defendants raise certain constitutional objections to the use of injunctive relief, alleging that it constitutes prior restraint of first amendment freedoms and unconstitutionally subjects alleged contemnors to trial without a jury. The first contention is without merit, since we hold that the defendants' conduct did not involve first amendment expression. The second allegation is not properly before this court since no contempt proceedings were held in this case, the plaintiffs' motion to cite some of the defendants for contempt having been denied.

area of first amendment freedoms, in the absence of any showing that notice and an opportunity to participate were impossible. The plaintiffs contend that, since the defendants' conduct clearly did not raise any legitimate first amendment issues, the *Carroll* doctrine is inapplicable to the present case. We agree that the trial court misapplied the *Carroll* decision to this case.

The *Carroll* case involved restraints of actual speech, not conduct. The petitioners in that case were restrained from holding public rallies because their militantly racist speeches constituted a clear and present danger of civil disturbance and riot. *Carroll, supra* at 177-78. In such circumstances, to be justified in restraining the petitioner's conduct the trial judge would have had to determine whether the speech was so "interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment." *Carroll, supra* at 180. The Supreme Court recognized that in such a situation the facts are "difficult to ascertain and even more difficult to evaluate" and therefore adversary proceedings are essential to insure a balanced analysis that does not excessively compromise first amendment rights. *Carroll, supra* at 183.

In this case, however, the defendants were engaged in conduct not speech. Their protest did not take the form of a public rally but instead involved the occupation of the private office of a university official. There could not be any good faith claim that this area was open to the public for the purpose of expressing dissident ideas. To hold that in such a situation the *Carroll* doctrine is applicable would be to abdicate the right of the judiciary to make any distinctions between speech and conduct. This would require a view of first amendment rights expressly rejected by the Supreme Court; that is, that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express

an idea." *United States* v. *O'Brien,* 391 U.S. 367, 376 (1968). *See also, Adderley* v. *Florida,* 385 U.S. 39, 47-48 (1966). We hold, therefore, that the continuing physical obstruction of the use of the facilities of plaintiff's office constituted conduct clearly outside the scope of first amendment rights and consequently the *ex parte* temporary restraining orders were not constitutionally invalid.

## III. THE APPLICABILITY OF H.R.C.P., RULE 17(d) TO *IN PERSONAM* ACTIONS.

The plaintiffs served process on certain of the defendants in this case under fictitious names. The trial court found this manner of service invalid because it failed to comply with the requirements set forth in H.R.C.P., Rule 17(d). Thus it dismissed the complaints against these defendants. The plaintiffs have appealed from this dismissal, contending that Rule 17(d) applies only to *in rem* actions and therefore should not be applied to the case at hand. H.R.C.P., Rule 17(d) provides:

> (d) UNIDENTIFIED DEFENDANT. When it shall be necessary or proper to make a person a party defendant and it shall appear by affidavit of the attorney that the affiant has been unable to ascertain the name of the defendant or a part of his name or to ascertain his identity, the court may on motion with or without notice order the action to proceed against him, adding a description of his interest in the action and stating so much of his name as is known. The person intended shall thereupon be considered a defendant to the action and as sufficiently described for all purposes, including service of process.

We believe that this rule is of general application and sets forth comprehensive procedures to be followed in all actions involving an unidentified defendant.

Rule 17(d), by requiring a description of the defendant's interest in the action, ensures that a person receiving the complaint will have sufficient notice that he is the defendant intended. A mere "John Doe" complaint without more specificity does not provide such notice, and a person receiving this type of service may safely and properly disregard the process, for the name is presumably that of another. Thus, the trial court correctly dismissed the complaints against the "John Doe" and "Mary Roe" defendants on the grounds that the plaintiffs had failed to give these defendants proper notice of the suit pending against them.

Finally, we do not agree with the plaintiffs that the defect in the designation of the Doe-Roe defendants was cured by the amendment of the pleadings, substituting the real names of the defendants for their fictitious ones. The record indicates that at the time of this amendment the defendants had not yet filed an appearance before the court. Nor were they represented by an attorney, so that no appearance was filed on their behalf. Thus, they were not legally before the court and the court had no jurisdiction to cure any defect in service by way of amendment.

We reverse the decision of the trial court invalidating the temporary restraining orders and affirm as to the other points raised on appeal.

*John S. Edmunds,* on behalf of American Civil Liberties Union of Hawai, for defendants-appellants, cross-appellees.

*Jack C. Morse,* Deputy Attorney General (*Bertram T. Kanbara,* Attorney General, State of Hawaii, of counsel) for plaintiffs-appellees, cross-appellants.