97 P.3d 395

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Harold Uhane JIM, Defendant–Appellant;**

**and**

**Norman Macomber, Sr., Samson Brown, Patrick Kahawaiola'a, and Richard Kela, Sr., Defendants**

**and**

**State of Hawai'i, Plaintiff–Appellee,**

**v.**

**Samson Brown and Patrick Kahawaiola'a, Defendants–Appellants;**

**and**

**Harold Uhane Jim, Norman McComber, Sr., and Richard Kela, Sr., Defendants.**

**Nos. 25513, 25527.**

Intermediate Court of Appeals of Hawai'i.

July 30, 2004.

As Amended Aug. 12 and Aug. 26, 2004.

Certiorari Denied Sept. 2, 2004.

Michael J. Udovic, Deputy Prosecuting Attorney, County of Hawaii, on the briefs, for Plaintiff–Appellee.

Jon N. Ikenaga, Deputy Public Defender, on the briefs, for Defendant–Appellant Harold Uhane Jim.

Samson Brown, on the briefs, Defendant–Appellant Pro Se.

Patrick Kahawaiola'a, on the briefs, Defendant–Appellant Pro Se.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Following a jury trial, Defendant–Appellant Harold Uhane Jim (Jim) appeals from the November 8, 2002 judgment (No. 25513); Defendant–Appellant Samson Brown (Brown) appeals from the November 8, 2002 judgment (No. 25527); and Defendant–Appellant Patrick Kahawaiolaʻa (Kahawaiolaʻa) appeals from the November 12, 2002 judgment (No. 25527), convicting them of Obstructing Government Operations, Hawaii Revised Statutes (HRS) § 710–1010(1)(a) (Supp.2003) [1] and/or [2] § 702–222(1)(b) (1993).[3] We affirm.

## I.

## PROCEDURAL BACKGROUND

On October 9, 2001, Jim, Brown, and Kahawaiolaʻa, along with Defendants Norman McComber, Sr., (McComber) and Richard Kela, Sr., (Kela) were charged by complaint with Obstructing Government Operations on October 8, 2001. When the five defendants demanded a jury trial, the case was transferred to the Circuit Court of the Third Circuit.

On November 6, 2001, the five defendants filed a motion to dismiss the complaint for lack of jurisdiction because, as stated by Kahawaiolaʻa,

> 1. I am a member of a class, granted by law, stated in terms of racial equality, by an Act of Congress under operation of law, Hawaiian Homes Commission Act,

1920 and not the political society constitution laws and usage, of said County–State of Hawaii's governments;

> 2. I was protesting against the Department of Water Supply, County of Hawaii, *government operations* and uses upon Hawaiian Home lands, which are not authorized by law or constitution;
>
> . . . .
>
> 4. [T]he Prosecuting Attorney's office acknowledges no documents exists [sic] regarding 'consent' [sic] of County officers managing of said Act which was mandated under § 4, State–Federal compact.

(Italics in original.)

On February 12, 2002, the five defendants filed a motion to dismiss the complaint for lack of jurisdiction "on the grounds that the County–State of Hawaii is without authority over government operations upon Hawaiian home lands, restricted lands, subject to the State–Federal compact clause, class legislation jurisdiction that arises of operation of law, Congress' acts pursuant to § 5 of the Fourteenth Amendment of the United States Constitution."

On May 6, 2002, after a hearing on February 26, 2002, Judge Riki May Amano (Judge Amano) entered an Order Denying Defendants' Pre–Trial Motion to Dismiss Complaint for Lack of Jurisdiction which stated, in relevant part, as follows:

---

1. Hawaii Revised Statutes (HRS) § 710–1010(1)(a) (Supp.2003) states as follows:

   **Obstructing government operations.** (1) A person commits the offense of obstructing government operations if, by using or threatening to use violence, force, or physical interference or obstacle, the person intentionally obstructs, impairs, or hinders:

   (a) The performance of a governmental function by a public servant acting under color of the public servant's official authority[.]

   HRS § 702–206 (1993) states, in relevant part, as follows:

   **Definitions of states of mind.** (1) "Intentionally."

   (a) A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct.

   (b) A person acts intentionally with respect to attendant circumstances when he is aware of

the existence of such circumstances or believes or hopes that they exist.

   (c) A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

2. *See State v. Cabral*, 8 Haw.App. 506, 810 P.2d 672 (1991).

3. HRS § 702–222(1)(b)(1993) states as follows:

   **Liability for conduct of another; complicity.** A person is an accomplice of another person in the commission of an offense if:

   (1) With the intention of promoting or facilitating the commission of the offense, the person:

   . . . .

   (b) Aids or agrees or attempts to aid the other person in planning or committing it[.]

## FINDINGS OF FACT

2. Article XII of the Hawaii State Constitution and the Hawaiian Homes Commission Act DOES NOT prevent the State of Hawaii from enforcing its laws because of "absen[ce of] consent" from Congress. *State v. Jim*, 80 Hawai'i 168, 907 P.2d 754 (1995)[.]

3. There are no provisions "in HHCA [Hawaiian Homes Commission Act] or its legislative history that indicates an intent to exempt Hawaiian home lands from the application of criminal laws." *State v. Jim*, 907 P.2d [754].

Jury selection occurred on July 29, 2002. The jury trial was held on July 30 and 31, 2002 and August 12, 2002. The jury entered its verdicts on August 13, 2002, finding Jim, Brown, and Kahawaiola'a guilty as charged, and McComber and Kela not guilty.

The November 8, 2002 Judgment sentenced Jim to probation for one year upon condition that he (a) pay a $50 Criminal Injuries Compensation fee and a $75 Probation Services fee, (b) appear at all proof of compliance hearings, and (c) "serve a jail term of six months to be served concurrently with his sentence in Cr. Nos. 01–1–0129 and 02–1–4" and that "[a]fter [his] one year jail sentence is completed in Cr. No. 01–1–0129 and Cr. No. 02–1–04, the remainder of [his] jail in this case shall be suspended."

The November 8, 2002 Judgment sentenced Brown to probation for one year upon condition that he pay a $50 Criminal Injuries Compensation fee and a $75 Probation Services fee "within 60 days of [his] sentence date." On November 25, 2002, the court entered an order granting Brown's motion for a stay of the sentence pending appeal.

The November 12, 2002 Judgment sentenced Kahawaiola'a to probation for one year upon condition that he pay a $50 Criminal Injuries Compensation fee, a $75 Probation Services fee, and a $500 fine. The Criminal Injuries Compensation fee, the Probation Services fee, and $400 of the $500 fine were stayed pending appeal.

Jim filed a notice of appeal on December 5, 2002, which appeal no. 25513 was assigned to this court on September 2, 2003. Brown and Kahawaiola'a filed their notice of appeal on December 10, 2002, which appeal no. 25527 was assigned to this court on July 2, 2003. The two appeals were consolidated for disposition by this court on March 4, 2004.

## II.

## FACTUAL BACKGROUND

On October 8, 2001, Puanani Waialeale–Kemp (Kemp), a County of Hawai'i Department of Water Supply (DWS) meter reader, and her partner were reading water meters on Hawaiian Home Lands (HHL) properties, in Keaukaha, island of Hawai'i. When they passed 112 Desha Avenue (the property), Kemp noticed people washing a car. The water was "[f]rom a spigot that ... was right center front of the lot." Kemp checked the account log and was unable to locate either an account or a water meter for the property. Kemp called DWS customer service supervisor Les Nakano (Nakano) to inform him of the situation.

Nakano checked the DWS records and discovered that the metered service at the property had been disconnected in November of 1997. Per DWS procedure, Nakano notified the DWS Field Operations Section charged with investigating such matters. DWS District Supervisor Dean Fukuyama (Fukuyama) dispatched a crew to determine whether an unauthorized water line (called an "unauthorized service lateral") was running from the main line to the property. The crew was comprised of DWS employees Carl Nishimura (Nishimura), Douglas Umeno (Umeno), and Wesley Kamimura (Kamimura). The crew was instructed to locate the unauthorized service lateral and the valve connecting it to the main line, shut off the valve, and disconnect the unauthorized service lateral from the main line.

In apparent anticipation of possible problems at the site and based on previous problems involving a similar situation, the DWS requested the assistance of the Hawai'i County Police Department. Police Officers Troy Castro and Jody Arruda were dispatched to "stand by" at the location. The Department of Hawaiian Home Lands

(DHHL) East Hawai'i District supervisor, Edward J. Andrade (Andrade), was notified. Andrade decided to go to the location to resolve any questions about the authority of the DWS to be present on HHL.

The crew arrived at the property between 8:30 and 9:00 a.m. Andrade and Officers Castro and Arruda were at the property when the crew arrived. The crew commenced digging to locate the valve that connected the unauthorized service lateral to the main line.

Kamimura testified that while the crew was digging, a man came and asked the crew to stop what they were doing. In response, the crew stopped working and went to their truck and sat in it. Then the man, and some of the other men who came with him, entered the hole and sat in it. In Kamimura's opinion, it would not have been safe for the crew to continue its work with other people around.

Umeno testified that while the crew was digging the hole, Jim and Kahawaiola'a "asked us if we could stop, so we just backed off" and Jim, Kahawaiola'a, and one or more others then entered and sat in the hole and held up the crew's work. After Jim, Kahawaiola'a, and the other men were taken away, the crew went back and completed their project.

Nishimura testified that the crew had to dig a hole about two-and-a-half feet deep to locate the valve and the unauthorized service lateral connected to the six inch main line.

Officer Castro testified, in relevant part, as follows:

A. Well [Jim] came up to me and told me that I shouldn't be doing my job there because . . . what I was doing was wrong.

Q. And what else did he say?

A. Well he said to the fact that I could get sued and the County was going to get sued because of my presence there.

Q. And what else did he say? Did he do?

A. Well after that he did originally sit in the hole and stop the Department of Water guys from working.

. . . .

Q. So . . . did he tell you why they were there?

A. Um, . . . that Department of Water was illegally . . . removing the water from that property. And that's why they were protesting that fact. They were going to stop them from . . . doing their work.

Q. And so what did they do then?

A. Well they sat down in the hole that the Department of Water was digging.

Officer Castro saw Jim, Kahawaiola'a, and Brown sitting in the hole and Kela sitting on the edge of the hole with one leg inside the hole. After the four were arrested, Officer Castro carried Jim out of the hole.

Sergeant Chaves testified that Jim and Kahawaiola'a "informed [him] that they weren't gonna allow the work to continue," and that Jim, Kahawaiola'a, and two others sat in the hole and said they were not going to move and were not going to allow the crew to do its work. The four "were asked to allow the water department . . . to do their work, and if they weren't gonna allow the work to be done, that they would be subject to arrest." Their response was "Go ahead." After the arrest, only Kahawaiola'a walked to the police van. The others were carried by the police.

At the conclusion of the State's case, the five defendants moved for a judgment of acquittal and Judge Amano denied the motion.

For the defense, Milton Donald Pavao, the manager of the DWS testified, in relevant part, as follows:

Q. What . . . is the authority of [the DWS] over the water systems on [HHL] in Keaukaha, specifically on [the property]?

A. Well, the [DHHL] issued to the [DWS] a license agreement to maintain, operate, and charge user fees for the water systems that are in [HHL].

. . . .

Q. Okay. And so do you pay the . . . Hawaiian Homes Commission?

A. No, we don't.

Q. Do they pay you?

A. No, they don't.

Q. Okay. Then how is the [DWS] compensated for its work in maintaining ... the water system on [HHL]?

A. By the user fees that we charge the residents or the lessees of [HHL].

. . . .

A. That area is basically served by two sources. One is the Pi'ihonua well up by the Carvalho Park, and the other one is Panaewa well located in Panaewa. . . .

. . . .

Q. Uh, are either of those well sources on [HHL]?

A. I think the Panaewa well site is on [HHL].

. . . .

Q. [D]id the [DWS] take over servicing those lines after they had been installed by Hawaiian Homes ... ?

. . . .

A. The contractor goes in, installs it. Upon completion of the water line the ... [DHHL] asks the [DWS] to take over the maintenance and operation, and that's the normal procedures.

Jim testified that when he received a phone call informing him that the DWS was going to shut off water service to an HHL lot, he and the co-defendants decided to go to the property to determine what was going on. When they arrived at the property, Jim saw the DWS crew excavating on the property. Jim approached the crew and asked what authority they had to excavate on HHL. When one of the crew responded "that they came to do a work [t]here[,]" Jim told him, "We believe that your authority does not exist on [HHL]. Therefore, the native Hawaiians community will protest against you being here." The crew indicated that they acknowledged the protest and would cooperate by standing on the side. After the crew had moved, a police officer approached and told Jim that his group was not authorized to do what it was doing. Jim further testified, in relevant part, as follows: [4]

A. And cordially ... [I] said, "We protesting," and I walked directly to the hole

and sit in the hole as protesting that those lands that I'm sitting on are part of my lands.

Q. ... [W]hat was the purpose in your conducting this protest?

A. On the land that requires compensation.

. . . .

Q. In your understanding, your belief, who is diverting funds?

A. The County of Hawai'i.

Q. In what way are they diverting funds?

A. My understanding they have an agreement with the [DHHL] that authorize them to use the land at little or no charges at all.

Q. And so who is not getting compensation?

A. It is clear the native Hawaiians. It's mandated under the act.

Q. Which act?

A. Admission act, State of Hawai'i constitution. The admission act, Section 3, and the ... Hawai'i constitution, Article XII, Section 3.

Q. And that says what?

A. That when they use the land they have fair compensation.

Q. When who uses the land?

A. Anyone that use the land has to ... pay a compensation.

Q. To who?

A. To the trust of the Hawaiian Home Commission Act.

Q. Did you have any particular expectations as to the result of your protest?

. . . .

A. To ... resolve the issue that the County of Hawai'i to be recognized as a trustee beneficiary relationship that they would uphold the provision that they swore to uphold the State and the people of Hawai'i's constitution, Article XII—XII and 3.

---

4. Except for the parts within brackets and the parts expressly omitted, the text of this quote is copied as written.

Q.   Okay. I'm gonna repeat this back to you a little bit just to make sure I understand.

... [W]hat you wanted as a result of this protest is to make clear or to make the point that the State should be acting as a trustee to the benefit of the native Hawaiian people on [HHL] as stated in the United States constitution?   Is that correct?

A.   That's right.

Q.   Thank you.   During this entire episode did any [DWS] personnel ever approach you and tell you get out of the hole and/or withdraw their consent to your protest?

A.   As we were protesting and in the hole, they take a look at the workers were there, step back and recognize, and there was no arguments of saying that they demanding they want their work.   None at all.

Q.   Okay. Did you at anytime tell either the water workers or the police that your intent was to stop the work that day?

A.   Not at all.

Q.   Did you ever express to the police or the water workers that you wished that this conduct—you were not going to allow any work to be completed?

A.   No, ... not at all.

. . . .

Q.   Why did you ask ... the [DWS], are they prohibited from being on [HHL]?

A.   Yes.

Q.   How are they prohibited?

A.   I did say to the foreman, that man was in charge.   I asked him if he was aware of the corporation counsel's letters explaining the encumbrance upon [HHL] was not authorized by the County.   His answer was he did not know that.

. . . .

Q.... [W]hat do you mean when you say "encumbrance"?

A.   My understanding on the admission act, Section 4 and the Hawai'i constitution, Section 3 are identical.   In that section Section 1, paragraph 1 clearly identify that there's prohibition on the encumbrance, and it means this.

On [HHL] the managing and operating on cannot be increased by officers other than, I believe, the Hawaiian Home commissioners of the act.

Q.   Thank you.   Would it be safe to say in your mind that if the [DWS] wanted to increase those encumbrance that you speak about, what would they need to do to be able to do that on [HHL]?

A.   Article XII of Hawai'i's constitution, Section 1, ... as the State of Hawaii had incorporate that into the state law that they have an authority to amend the act of the Hawaiian Home Commission Act to allow, uh, amendments to incorporate officers to manage and operate [HHL].

Q.   Other than the Hawaiian Home commissioners?

A.   Well, they have an opportunity to amend it, and the state legislation, they could even—the state legislation could even amend the act and allow the county officers to operate and manage the act if they wanted to, but there is a referendum and a process to allow that to happen.

This case we believe they did not have the consent, and that's the reason we were there protesting.   One of the reasons.

Q.   And when you say "one of the reasons" were because they lacked the consent, and that consent would need to come from who to authorize officers other than Hawaiian Home officers to manage and do what they need to do on [HHL]?

A.   Hawai'i constitution Article XII clearly identify that any increase of that encumbrance has to receive consent of the United States.

. . . .

Q.   And it is your understanding "officers" that are not charged with the administration of the Hawaiian Home Commission Act needs consent of the United States to operate [HHL]?

A.   In my opinion reading the prohibition of Section 4 and Hawai'i's constitution it means government officers, county, state may not interfere with the commissioners in operating the Hawaiian Home Commission Act.

. . . .

Q. And again before I close, Mr. Jim, the purpose of your protest that day at [the property] clearly identified as being [HHL], your purpose, would you please again state your purpose?

A. Protest—protesting against the county officers unauthorized to use Hawaiian Home lands and diverting the revenues that—from that use of the land and no fair compensation as has been given to the Hawaiian trust. That is my reason for protesting.

. . . .

Q. Okay. Now, isn't it correct that in order to enact that amendment allowing for the charging of user fees the consent of the United States Congress was required?

A. Definite.

Q. Was that consent obtained, to the best of your knowledge?

A. My understanding that I monitor the United States Congress activities, none whatsoever have appeared.

Q. Okay. Is that one of your contentions that, in fact, Department of Water Supply's charging of user fees is illegal?

A. Definite.

Kahawaiolaʻa testified, in relevant part, as follows: [5]

I was peacefully protesting on [HHL] against the actions of the County of Hawaii, who I believe at that particular time failed to receive the consent of the United States to come forward and increase the encumbrance upon [HHL] as so stated in Hawaiʻi state constitution and the admissions act, and that is my primary purpose.

. . . .

Q. Mr. Kahawaiolaʻa, did you ever at any time, by word or conduct, threaten or indicate to the water crew that you were there to stop their work?

A. No. I—my only address to them was that I was here protesting the fact that they've lacked the authority to be on [HHL].

. . . .

Q. When you arrived at the site that the [DWS] crew was at . . . ?

. . . .

Q. . . . .

What is your recollection of what you saw?

A. My recollection of it is that there were three people working at the hole. One was inside the hole, um, working with a—shovel. Two was in the hole. One was outside of the hole.

I approached the hole and asked them to stop working, uh, because we were going to protest. We stood up there and say, "I'm coming here to protest. I believe what you doing is illegal, and we're going to protest, and would you allow us to protest?"

And they gathered their—there was a buster line down. One man took it, carried it away. The other guy had already—one had already left, and the other person just picked the two other implements and walk back to their truck.

Andrade testified, in relevant part, as follows:

Q. Okay. Could you explain what the dispute is?

A. Um, these gentlemen believe . . . that they should get water free of all charge, and the department says that that's not the case.

Q. And when you say "the department," who is the final authority within the department to make these decisions?

A. The Hawaiian Homes Commission.

. . . .

Q. Now, . . . how were you notified what the department's position was on the water issue?

A. That case actually had started, the case with these gentlemen and the water issue, had started prior to me starting with the department. And we had what we call a contested case hearing, which is like an administrative hearing where the homesteader, the lessee, has an opportunity to

---

**5.** Except for the parts within brackets and the parts expressly omitted, the text of this quote is copied as written.

provide their case or their reasons, you know, why they think a certain issue is one way, and we do the opposite. It's a quasi-judicial type of hearing, and the commission had ruled at that time that . . . if you were gonna take water from the [DWS], you needed to pay for that service.

. . . .

Q. What did you tell Sergeant Chaves?

A. I said that . . . these guys were breaking the law. They needed to do what they needed to do to enforce the law. I didn't tell 'em what to do.

On July 10, 2002, the State filed a Motion in Limine to Preclude Undisclosed Defenses. On August 12, 2002, at the conclusion of the evidence, the court inquired whether any of the five defendants would be raising any First Amendment issues. The five defendants replied in the affirmative. In response, the State argued that there had been no "prima facie" showing that such a defense applied because (a) there was no expression of speech, (b) the regulation involved regulated conduct, not speech, and (c) there were other alternative means available to the defendants, such as setting up informational picket lines or handing out literature, instead of sitting in the hole.

The court granted the State's motion in limine with one reservation as follows:

The court is going to grant the motion in limine. The first and fourth amendments of the constitution are not unfettered, and the defendants have failed to establish a prima facie showing that their rights to exercise the first and fourth amendments in this situation, consider the time, place, and manner of their actions, their individual speech, as well as their speech as demonstrated by their actions, the court finds that the exercise of their purported exercise of their constitutional rights do not allow them to obstruct government operations.

For those reasons, I am going to prohibit the constitutional arguments in closing argument and jury instructions. However, I believe . . . that it may go to the issue of intent, and the defendants may be able to argue that they did not intend that their actions violate the law and instead they

intended to communicate their positions or philosophies by their actions. However, this—this allowance will only be given if the defense offers a jury instruction that will clearly instruct the jury on how to treat that argument on closing.

In his closing argument to the jury, counsel for Jim argued, in relevant part, as follows:

The water people didn't have to comply, and they knew it. Instead they did, and they allowed [Jim] and his fellow native Hawaiians to do their thing. He was given consent. The conduct that occurred was not obstructing if they were given consent. They were given consent to do what they had asked to be allowed to do.

. . . .

The police went down that day and asked them to move so the work could continue, but nobody from the water department told them that the consent had been withdrawn, and nobody from the police department told them the consent had been withdrawn. They only told them that, "The water guys can't work if you guys don't move." So they stayed in the hole.

The work can't continue. That's obvious. That's obvious to Mr. Jim, that's obvious to everybody. Of course, that's why they were there. That's why and what they told the water department what their purpose was. They were there, and they asked them to stop working, and they did. That's not obstructing.

. . . .

Mr. Jim told you and the police and the water department people what his intent was. . . .

He knows the Hawaiian Homes Commission Act like the back of his hand. . . . He relies on these laws and the promises made by our country to the Hawaiian people. He relies on these laws and believes in the rights and the promises made to him so strongly that he's prepared to take a stand.

. . . .

... [T]here are inconsistencies in the law when it was originally passed and in amendments later....

Portions of that law say they have a right to free water, other portions say they are supposed to pay user fees....

The fact is Mr. Jim and his fellows had no criminal intent. They did not intend to obstruct. They approached and were given permission to protest, and that permission was never withdrawn.

In his closing argument to the jury, Kahawaiola'a stated, in relevant part, as follows:

[M]y intentions were to go there and to prevent governmental operations by government servants, public servants who were there working under the color of authority to do the work that they were assigned and sent to do. My message is, stop the illegal use of Hawaiian Home Lands by non administrators of the Hawaiian Homes Commission Act as amended and for the unfair compensation to our trust. Non-administrators of our property, of our lands, of those special lands can easily become an administrator, all they need to do is go and seek the consent of congress. With that consent, they can then become the administrators of the land and do what they did at 112 Desha Avenue, [HHL].

. . . .

I have mentioned that my physiological makeup by itself tends to obstruct, and if that's a crime, I am guilty of it....

Native Hawaiians are not special, Hawaiian Home Lands are special.

In his closing argument to the jury, Brown stated, in relevant part, as follows: [6]

In the year 1963, State of Hawaii legislation—two legislation. They eliminated the Hawaiian Home Commissions and inserted the Department of Hawaiian Home Lands, which means they amended the act. Without the consent of the United States. That goes back to Title IV. Inconsistent legislation. Now, when they made the Department of Hawaiian Home Lands, they controlled everything, but they were not authorized.

Now we come up to where we are, in the year 2002. Still they didn't have no consent from congress for what say that they are authorized, the Department of Home Lands are authorized to run the government, to run the Hawaiian Home Commission lands.

. . . .

Like one of the jurors says, it's not fair they overthrow the Hawaiian Home Commission and insert the Department of Hawaiian Home Lands and ignore the statutes that they had to follow. Is not fair that they place burden on us for water rights when the Hawaiian Home Commission, it states water free all charges. It's not fair that the water wells is located on Hawaiian Home Lands, they use those wells without fair compensation and at the same time charges us for use of those wells. Not fair that these whole issues of Hawaiian Home Lands, that they have title to these lands. It's not fair that they don't follow the Constitution of the United States that states for the betterment of Hawaiian Home Lands. It's just not fair, I believe. If they're not authorized to do these things, how can you just go about and do it without consent or anything.

So, ladies and gentlemen of the jury, all I can say to you, I believe they are not authorized to insert their laws, the Department of Hawaiian Home Lands, the County of Hawaii, or any other entities, to insert their laws or provisions on Hawaiian Home Lands without the consent of congress. Thank you very much.

On August 12, 2002, Jim filed Defendant's Requested Jury Instructions. One of the instructions he requested was Hawai'i Standard Jury Instruction No. 7.12, Choice of Evils–Necessity. The court read this instruction to the jury as follows:

It is a defense to the offense charged that the defendant's conduct was legally justified. The law recognizes the "choice of evils" defense, also referred to as the "necessity" defense.

The "choice of evils" defendant [sic] justifies a defendant's conduct if the defen-

---

**6.** Except for the parts expressly omitted, the text of this quote is copied as written.

dant reasonably believed that compliance with the law would have resulted in greater harm to himself or another than the harm sought to be prevented by the law defining the offense charged.

In order for the "choice of evils" defense to apply, four conditions may be satisfied. First, the defendant must have reasonably believed that there was no legal alternative available to him. Second, the defendant must have reasonably believed that the harm sought to be prevented was eminent [sic] or immediate. Third, the defendant's conduct must have been reasonably designed to actually prevent the threat of greater harm. Fourth, the harm sought to be avoided must have been greater than the harm sought to be prevented by the law defining the offense charged.

Accordingly, if the prosecution has not proved beyond a reasonable doubt that the defendant's conduct was not legally justified by the "choice of evils" defense, then you must find the defendant not guilty of obstruction of government operations. If the prosecution has done so, ... then you must find that the choice of evils defense does not apply.

No .one objected to this instruction.

## III.

## DISCUSSION

### A.

Brown and Kahawaiola'a contend that the court "erred in denying Defendants' enforcement in the courts of such State, a right under Art. XII, compact with the United States";[7] "acted in 'absence of jurisdiction

---

7. Article XII of the Constitution of the State of Hawai'i (2003) states as follows:

**HAWAIIAN AFFAIRS**
**HAWAIIAN HOMES COMMISSION ACT**
    **Section 1.** Anything in this constitution to the contrary notwithstanding, the Hawaiian Homes Commission Act, 1920, enacted by the Congress, as the same has been or may be amended prior to the admission of the State, is hereby adopted as a law of the State, subject to amendment or repeal by the legislature; provided that if and to the extent that the United States shall so require, such law shall be subject to amendment or repeal only with the consent of the United States and in no other manner; provided further that if the United States shall have been provided or shall provide that particular provisions or types of provisions of such Act may be amended in the manner required for ordinary state legislation, such provisions or types of provisions may be so amended. The proceeds and income from Hawaiian home lands shall be used only in accordance with the terms and spirit of such Act. The legislature shall make sufficient sums available for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3) and (4) herein, by appropriating the same in the manner provided by law.
    Thirty percent of the state receipts derived from the leasing of cultivated sugarcane lands

under any provision of law or from water licenses shall be transferred to the native Hawaiian rehabilitation fund, section 213 of the Hawaiian Homes Commission Act, 1920, for the purposes enumerated in that section. Thirty percent of the state receipts derived from the leasing of lands cultivated as sugarcane lands on the effective date of this section shall continue to be so transferred to the native Hawaiian rehabilitation fund whenever such lands are sold, developed, leased, utilized, transferred, set aside or otherwise disposed of for purposes other than the cultivation of sugarcane. There shall be no ceiling established for the aggregate amount transferred into the native Hawaiian rehabilitation fund.
**ACCEPTANCE OF COMPACT**
    **Section 2.** The State and its people do hereby accept, as a compact with the United States, or as conditions or trust provisions imposed by the United States, relating to the management and disposition of the Hawaiian home lands, the requirement that section 1 hereof be included in this constitution, in whole or in part, it being intended that the Act or acts of the Congress pertaining thereto shall be definitive of the extent and nature of such compact, conditions or trust provisions, as the case may be. The State and its people do further agree and declare that the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian homes projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out.
**COMPACT ADOPTION; PROCEDURES AFTER ADOPTION**
    **Section 3.** As a compact with the United States relating to the management and disposition of the Hawaiian home lands, the Hawaiian Homes Commission Act, 1920, as amend-

and in breach of trust' in ordering Defendants' [sic] to submit to County Government criminal operation on restricted lands"; and "erred in acknowledging the Hawai'i Supreme Court in *State v. Jim decision* [sic] operation [sic] of a broken trust."

In their opening brief, Brown and Kahawaiola'a assert, in relevant part, as follows:

This case and appeal concerns the broad state-federal question of whether Judge Amano is authorized by an act of Congress to submit Defendants' [sic] to criminal operation in conformity with the governing compacts between the State of Hawaii and the United States.

. . . .

. . . [T]he state-county government may not legislate or adjudicate any supposed criminal operation committed by its beneficiaries on Hawaiian Home lands. The Defendants' [sic] are protesting against the county, for present use, *NO* fair compensation and for "breach of trust and fraud."

The State or its court must follow the terms of the trust as embodied in Congress' Homestead Act even if they believe that a different course might prove more beneficial, of a criminal operation upon Hawaiian Home lands. If the State or its

Court wishes to deviate from the terms of Congress' Homestead Act, then the act must be amended.

. . . .

. . . [I]t is equally unfair for Hawaii Supreme Court to stick its head in the sand and preempt consideration of the facts and equities and violate Defendants' rights under the equal protection clause of section 5, Fourteenth Amendment of the United States Constitution.

(Emphasis in original.)

Based on the following, we conclude that the state's criminal jurisdiction encompasses all areas within the territorial boundaries of the State of Hawai'i. HRS § 701–106 (1993) states, in pertinent part, as follows:

Territorial applicability. (1) Except as otherwise provided in this section, a person may be convicted under the law of this State of an offense committed by the person's own conduct or the conduct of another for which the person is legally accountable if:

(a) Either the conduct or the result which is an element of the offense occurs within this State[.]

---

ed, shall be adopted as a provision of the constitution of this State, as provided in section 7, subsection (b), of the Admission Act, subject to amendment or repeal only with the consent of the United States, and in no other manner; provided that (1) sections 202, 213, 219, 220, 222, 224 and 225 and other provisions relating to administration, and paragraph (2) of section 204, sections 206 and 212 and other provisions relating to the powers and duties of officers other than those charged with the administration of such Act, may be amended in the constitution, or in the manner required for state legislation, but the Hawaiian home-loan fund, the Hawaiian home-operating fund and the Hawaiian home-development fund shall not be reduced or impaired by any such amendment, whether made in the constitution or in the manner required for state legislation, and the encumbrances authorized to be placed on Hawaiian home lands by officers other than those charged with the administration of such Act, shall not be increased, except with the consent of the United States; (2) that any amendment to increase the benefits to lessees of Hawaiian home lands may be made in the constitution, or in the manner required for state legislation, but the qualifica-

tions of lessees shall not be changed except with the consent of the United States; and (3) that all proceeds and income from the "available lands," as defined by such Act, shall be used only in carrying out the provisions of such Act.

PUBLIC TRUST

Section 4. The lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as "available lands" by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public.

OFFICE OF HAWAIIAN AFFAIRS; ESTABLISHMENT OF BOARD OF TRUSTEES

. . . .

TRADITIONAL AND CUSTOMARY RIGHTS

Section 7. The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

In *State v. Jim*, 80 Hawai'i 168, 907 P.2d 754 (1995), Jim and Kahawaiola'a asserted that the HHL are federal lands not within the criminal jurisdiction of the State of Hawai'i. The Hawai'i Supreme Court concluded that the HHL located within the State of Hawai'i are subject to the State's criminal jurisdiction. The decision recognized that the State's criminal jurisdiction encompasses all areas within the territorial boundaries of the State of Hawai'i.

■ In light of the following statement of relevant law, this court must follow the precedent announced in *State v. Jim*.

"[S]tare decisis relates to the effect of legal propositions announced in prior adjudications upon subsequent actions which involve similar questions between strangers to the proceedings in which the adjudications were made." Under the doctrine of *stare decisis,* "where a [legal] principle has been passed upon by the court of last resort, it is the duty of all inferior tribunals to adhere to the decision . . ., until the decision has been reversed or overruled by the court of last resort or altered by legislative enactment." The doctrine does not apply to a motion for reconsideration, because it is not a "subsequent action[ ]," but, rather, part of the subject proceeding.

*Soderlund v. Admin. Dir. of Courts,* 96 Hawai'i 114, 119 n. 8, 26 P.3d 1214, 1219 n. 8 (2001) (citations and single quotes omitted; brackets in original).

### B.

Jim contends that "[t]he court plainly erred in giving its choice of evils instruction which contained common law elements not set forth in the express language of HRS § 703–302 and there was a reasonable possibility that the error contributed to Jim's conviction."

HRS § 703–302 (1993) states, in relevant part, as follows:

**Choice of Evils.** (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:

(a) The harm or evil sought to be avoided by such **conduct** is greater than

that sought to be prevented by the law defining the offense charged; and

(b) Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(c) A legislative purpose to exclude the justification claimed does not otherwise plainly appear.

HRS § 703–300 (1993) states, in relevant part, "In this chapter, unless a different meaning is plainly required: 'Believes' means reasonably believes."

In *State v. Maumalanga,* 90 Hawai'i 58, 59, 976 P.2d 372, 373 (1998), the Hawai'i Supreme Court held

that the elements of the choice of evils defense are set forth, in their entirety, in the express language of the aforementioned statute and do not include additional elements from the "common law" formulation as set forth in *State v. Kealoha,* 9 Haw.App. 115, 826 P.2d 884 (1992), and *State v. DeCastro,* 81 Hawai'i 147, 913 P.2d 558 (App.1996), because they were superseded by the adoption of the Hawai'i Penal Code in 1973.

■ As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error. *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998). This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights. *Id.,* at 330, 966 P.2d at 642 (citations omitted).

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. If that standard is met, however, the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews *de novo.*

*State v. Vanstory,* 91 Hawai'i 33, 43, 979 P.2d 1059, 1069 (1999) (internal quotation marks, citations, and brackets omitted).

▪▪ Viewing the issue from Jim's perspective, we conclude that the court erred when the court gave its choice of evils instruction because, for the following reasons, the evidence did not support a choice of evils instruction. First, assuming Jim reasonably believed that his actions were necessary to avoid an imminent harm or evil to him or to another, the harm or evil sought to be avoided by such conduct was not greater than that sought to be prevented by the law defining the offense charged. Second, a legislative purpose to exclude the justification claimed plainly appears. We further conclude that there is no reasonable possibility that the error contributed to Jim's conviction.

### C.

▪ We review questions of constitutional law "by exercising our own independent constitutional judgment based on the facts of the case." *State v. Rogan,* 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999) (citations omitted). Consequently, "we review questions of constitutional law under the right/wrong standard." *State v. Mallan,* 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998) (citation omitted).

▪ Jim asserts that "the court plainly erred in failing to dismiss the charges against Jim as violating his right to free speech under the First Amendment to the U.S. Constitution and Article I, Section 4 of the Hawai'i State Constitution." In other words, Jim contends that (a) as a matter of law, his "conduct constituted a protected exercise of his constitutional right to free speech, and (b) that because of contention (a), the court was required, *sua sponte,* to dismiss the charges against him. For the following reasons, we disagree with contention (a) and do not reach contention (b). The following quotes state the relevant and dispositive precedent.

> We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. We find that the 1965 Amendment to s 12(b)(3) of the Universal Military Training and Service Act meets all of these requirements, and consequently that O'Brien can be constitutionally convicted for violating it.

*United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968) (footnotes omitted).

> In *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court dealt with incidental restrictions on free speech occasioned by the exercise of the governmental power to conscript men for military service. O'Brien had burned his Selective Service registration certificate on the steps [416 U.S. 411, 94 S.Ct. 1810] of a courthouse in order to dramatize his opposition to the draft and to our country's involvement in Vietnam. He was convicted of violating a provision of the Selective Service law that had recently been amended to prohibit knowing destruction or mutilation of registration certificates. O'Brien argued that the purpose

and effect of the amendment were to abridge free expression and that the statutory provision was therefore unconstitutional, both as enacted and as applied to him. Although O'Brien's activity involved "conduct" rather than pure "speech," the Court did not define away the First Amendment concern, and neither did it rule that the presence of a communicative intent necessarily rendered O'Brien's actions immune to governmental regulation. Instead, it enunciated the following four-part test: "(a) government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679.

Of course, none of these precedents directly controls the instant case. In O'Brien the Court considered a federal statute which on its face prohibited certain conduct having no necessary connection with freedom of speech. This led the Court to differentiate between "speech" and "nonspeech" elements of a single course of conduct, a distinction that has little relevance here. Both *Tinker* [*v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) ] and *Healy* [*v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) ] concerned First and Fourteenth Amendment liberties in the context of state educational institutions, a circumstance involving rather different governmental interests than are at stake here. In broader terms, however, these precedents involved incidental restrictions on First Amendment liberties by governmental action in furtherance of legitimate and substantial state interest other than suppression of expression.

*Procunier v. Martinez*, 416 U.S. 396, 411–12, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974).

In this case, however, the defendants were engaged in conduct not speech. Their protest did not take the form of a public rally but instead involved the occupation of the private office of a university official. There could not be any good faith claim that this area was open to the public for the purpose of expressing dissident ideas. To hold that in such a situation the Carroll [*Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) ] doctrine [pertaining to *ex parte* injunctions in the area of first amendment freedoms] is applicable would be to abdicate the right of the judiciary to make any distinctions between speech and conduct. This would require a view of first amendment rights expressly rejected by the Supreme Court; that is, that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express [52 Haw. 434, 478 P.2d 320] an idea." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). *See also, Adderley v. Florida*, 385 U.S. 39, 47–48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). We hold, therefore, that the continuing physical obstruction of the use of the facilities of plaintiff's office constituted conduct clearly outside the scope of first amendment rights and consequently the *ex parte* temporary restraining orders were not constitutionally invalid.

*Kleinjans v. Lombardi*, 52 Haw. 427, 433–34, 478 P.2d 320, 324–25 (1970).

In *State v. Guzman*, 89 Hawai'i 27, 968 P.2d 194 (App. 1998), this court stated,

We cannot agree with Defendants' contention that HRS § 852–1 [which prohibited the obstruction of "ingress to or egress from any public or private place"] must be struck down on the basis that it chills free expression. As was said in *Cox* [*v. Louisiana*, 379 U.S. [559], 85 S.Ct. [476] 13 L.Ed.2d 487 (1965) ], "[w]e deal in this case not with free speech alone, but with expression mixed with particular conduct." *Cox*, 379 U.S. at 564, 85 S.Ct. 476. Discussing the application of a statute that prohibited the obstruction of public passages, the Court in *Cox* recognized the competing interests of "the right of a State or municipality to regulate the use of city

streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." [*Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).] The Court explained that

> [t]he constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.... Governmental authorities have the duty and responsibility to keep their streets open and available for movement....

> We emphatically reject the notion ... that the First and Fourteenth Amendments [of the U.S. Constitution] afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech.

*Id.* at 555, 85 S.Ct. 453.

HRS § 852–1 does not prohibit picketing or the communication of messages altogether; it is specifically aimed at conduct causing an obstruction of ingress to or egress from public or private places in a manner so as not to leave a free passageway for persons seeking ingress to or egress from those places. Individuals may continue to exercise rights guaranteed by the first amendment to the United States Constitution and section 4 to the Hawai'i Constitution, as long as they do not do so in a manner prohibited by HRS § 852–1.

> [The statute in *Cameron* [*v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335 [20 L.Ed.2d 182] (1968) ] did] not prohibit picketing so intertwined [with free expression and association] unless engaged in in a manner which obstructs or unreasonably interferes with ingress or egress to or from the courthouse. *Prohibition of conduct which has this effect does not abridge constitutional liberty since such activity bears no necessary relationship to the freedom to [ ... ] distribute information or opinion.*

*Cameron*, 390 U.S. at 617, 88 S.Ct. 1335 (internal quotation marks and citation omitted) (emphasis added). Hence, we cannot conclude that any chilling effect that HRS § 852–1 *may* have on the exercise of these rights warrants striking down a statute which is designed "to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use[.]" *Cox*, 379 U.S. at 554, 85 S.Ct. 453.

89 Hawai'i at 36, 968 P.2d at 203.

Consistent with the above precedent, we conclude that Jim's continuing physical obstruction of the lawful work by the DWS on the property constituted conduct clearly outside the scope of any first amendment right to freedom of speech.

## IV.

## CONCLUSION

Accordingly, we affirm the November 8, 2002 judgment convicting defendants-appellants Harold Uhane Jim and Samson Brown and the November 12, 2002 judgment convicting Patrick Kahawaiola'a of Obstructing Government Operations, Hawai'i Revised Statutes § 710–1010(1)(a) (Supp.2003) and/or § 702–222(1)(b) (1993).